**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**UNITED STATES OF AMERICA**

       -v.-                          **16-CR-468 (GHW)**

**JAMES GRANT,** *et al.,*

                      *Defendants.*

-----------------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF
## DEFENDANT MICHAEL HARRINGTON'S PRETRIAL MOTIONS

THE WEINSTEIN LAW FIRM PLLC
Andrew J. Weinstein
Barrie A. Dnistrian
800 Third Avenue, 18th Floor
New York, NY 10022
T:  (212) 582-8900
F:  (212) 582-8989
E: aweinstein@twlf.com
   bdnistrian@twlf.com

LAW OFFICE OF MARC FERNICH
Marc Fernich
Giuliana Graham
810 Seventh Avenue, Suite 620
New York, NY 10019
T: (212) 446-2346
F: (212) 459-2299
E: maf@fernichlaw.com
   ggraham@fernichlaw.com

*Attorneys for Defendant Michael*
*Harrington*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................ iv

**STATEMENT** .................................................................................................. 1

**BACKGROUND** ............................................................................................. 3

**ARGUMENT** .................................................................................................. 4

**POINT I: THE INDICTMENT MUST BE DISMISSED BECAUSE THE BRIBERY THEORY IT ALLEGES – SOUNDING IN AN AGREEMENT TO TAKE OFFICIAL ACTION "AS NEEDED" AND "AS OPPORTUNITIES AROSE" – HAS BEEN ABOLISHED BY *MCDONNELL V. U.S.*** ................ 4

    A.    STATEMENT ........................................................................ 4

    B.    *MCDONNELL* EVISCERATES THE STREAM OF BENEFITS THEORY .................................................. 6

        1.    *McDonnell*'s Guidance Relative to Stream of Benefits .. 7

        2.    The Stream of Benefits Theory Is Incompatible with *McDonnell* and Doesn't Survive It ............................ 9

    C.    *GANIM* IS ANALYTICALLY FLAWED EVEN ON ITS OWN TERMS ............................................................................ 14

    D.    THE GOVERNMENT'S PROBABLE RETORTS ARE UNAVAILING ...................................................................... 20

    E.    CONCLUSION ...................................................................... 24

**POINT II: THE INDICTMENT LACKS SUFFICIENT SPECIFICITY AND PLEADS NO COGNIZABLE OFFICIAL ACTS, FAILING TO CHARGE A CRIME** ...................................................... 25

A.    THE INDICTMENT ........................................................ 26

B.    LEGAL STANDARD ...................................................... 27

  1.    Indictment Sufficiency ....................................... 27

  2.    "Official Acts" ................................................... 29

C.    ARGUMENT ................................................................. 30

D.    CONCLUSION .............................................................. 33

**POINT III: COUNTS FOUR THROUGH SEVEN MUST BE DISMISSED TO THE EXTENT THEY CHARGE ILLEGAL GRATUITIES** ........................................................ 33

**POINT IV: THE COURT SHOULD INSPECT THE GRAND JURY INSTRUCTIONS *IN CAMERA*** ................................... 34

**POINT V: THE GOVERNMENT SHOULD FURNISH LIMITED PARTICULARS NECESSARY FOR DEFENSE PREPARATION** .................................................... 36

A.    LEGAL STANDARD ...................................................... 37

B.    ARGUMENT ................................................................. 38

**POINT VI: THE GOVERNMENT SHOULD IMMEDIATELY IDENTIFY THE DOCUMENTS AND TAPES IT SEEKS TO INTRODUCE AS EVIDENCE AT TRIAL** ............... 42

**POINT VII: THE SIXTH AMENDMENT – IF NOT THE FIFTH – ENTITLES DEFENDANTS TO EARLY *BRADY/GIGLIO* DISCLOSURE** .............................................................. 45

**POINT VIII: ALMOST CERTAIN SPILLOVER PREJUDICE ENTITLES HARRINGTON TO A SEPARATE TRIAL** ...... 47

A.    ALLEGATIONS OF HOOKERS AND GUNS .................... 48

B.    ARGUMENT ................................................ 49

C.    CONCLUSION ............................................. 54

**POINT IX: HARRINGTON JOINS IN ALL MOTIONS OF CODEFENDANTS REICHBERG AND GRANT TO THE EXTENT APPLICABLE TO HIM AND NOT INCONSISTENT WITH THE ARGUMENTS SET FORTH HEREIN** .............. 54

**CONCLUSION** .................................................. 55

# TABLE OF AUTHORITIES

## Cases

*Brady v. Md.*, 373 U.S. 83 (1963) .................................................. 2, 45-46

*Burrage v. U.S.*, 134 S. Ct. 881 (2014) ............................................... 6

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) ............... 22

*Fernandez v. Johnson*, No. 12 Civ. 2774 (LBS), 2013 WL 796542 (SDNY Mar. 5, 2013) ................................................................................ 13

*Giglio v. U.S.*, 405 U.S. 150 (1972) ................................................ 2, 45-46

*In re Coppa*, 267 F.3d 132 (CA2 2001) ............................................. 45-46

*Lafler v. Cooper*, 566 U.S. 156 (2012) .............................................. 46

*McCormick v. U.S.*, 500 U.S. 257 (1991) ........................................... 15

*McDonnell v. U.S.*, 136 S. Ct. 2355 (2016) .................................... *passim*

*Mo. v. Frye*, 566 U.S. 134 (2012) ..................................................... 46

*Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*, No. 1:11–CV–01074, 2011 WL 4005396 (N.D. Ohio Sept. 8, 2011) .......................... 13

*U.S. v. Aleynikov*, 676 F.3d 71 (CA2 2012) ...................................... 25

*U.S. v. Barnes*, 158 F.3d 665 (CA2 1998) ......................................... 38

*U.S. v. Bin Laden*, 92 F. Supp. 2d 225 (SDNY 2000) .......................... 41

*U.S. v. Bortnovsky*, 820 F.2d 572 (CA2 1987) ................................. 37, 38

*U.S. v. Boyland*, 862 F.3d 279 (CA2 2017) ...................................... 6, 18

*U.S. v. Brito*, 907 F.2d 392 (CA2 1990) ........................................... 34

*U.S. v. Bruno*, 661 F.3d 733 (CA2 2011) .......................................... 21

*U.S. v. Carson*, 464 F.2d 424 (CA2 1972) ........................................ 44

*U.S. v. Chalmers*, 410 F. Supp. 2d 278 (SDNY 2006) ........................ 37, 47

*U.S. v. Chalmers*, 474 F. Supp. 2d 555 (SDNY 2007) ........................ 43, 49

iv

*U.S. v. Chiarizio*, 525 F.2d 289 (CA2 1975) .................................................. 44

*U.S. v. Davidoff*, 845 F.2d 1151 (CA2 1988) ............................................ 39-40

*U.S. v. Emmenegger*, 329 F. Supp. 2d 416 (SDNY 2004) ..................... 6, 13

*U.S. v. Evans*, 504 U.S. 255 (1992) ...................................................... *passim*

*U.S. v. Falkowitz*, 214 F. Supp. 2d 365 (SDNY 2002) ............................... 37

*U.S. v. Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007) ............... 37, 38, 42

*U.S. v. Fernandez*, 722 F.3d 1 (CA1 2013) ............................................... 33

*U.S. v. Forde*, 740 F. Supp. 2d 406 (SDNY 2010) .................................... 35

*U.S. v. Gallo*, 668 F. Supp. 736 (EDNY 1987) ..................................... 53-54

*U.S. v. Ganim*, 510 F.3d 134 (CA2 2007) ........................................... *passim*

*U.S. v. Giffen*, 379 F. Supp. 2d 337 (SDNY 2004) ............................... 38, 44

*U.S. v. Gilbert*, 504 F. Supp. 565 (SDNY 1980) ...................................... 53

*U.S. v. Hoey*, No. S3 11 CR 337 (PKC), 2014 WL 2998523 (SDNY July 2, 2014) ............................................................................................................ 35

*U.S. v. Jailall*, No. 00 CR 69 (RWS), 2000 WL 1368055 (SDNY Sept. 20, 2000) ............................................................................................................ 34

*U.S. v. Kasper*, No. 10 CR 318 (HBS), 2011 WL 7098042 (WDNY June 20, 2011) ............................................................................................................ 34

*U.S. v. Kemp*, 500 F.3d 257 (CA3 2007) ..................................................... 4

*U.S. v. Levasseur*, 846 F.2d 786, 792 (CA1 1988) .................................... 34

*U.S. v. Lino*, No. 00 CR 632 (WHP), 2001 WL 8356 (SDNY Jan. 2, 2001) ..................................................................................................................... 44

*U.S. v. Lopez-Lopez*, 282 F.3d 1 (CA1 2012) ........................................... 34

*U.S. v. McDermott*, 245 F.3d 133 (CA2 2001) .......................................... 54

*U.S. v. McDonnell*, 64 F. Supp. 3d 783 (E.D. Va. 2014), *aff'd*, 792 F.3d 478 (CA4 2015), *rev'd*, 136 S. Ct. 2355 (2016) ............................................. 7-8

*U.S. v. Menendez, et al.*, No. 15-CR-155 (WHW) (D. N.J.) .................. 23

*U.S. v. Moten*, 582 F.2d 654 (CA2 1978) .................................... 35

*U.S. v. Papadakis*, 510 F.2d 287 (CA2 1975) ............................... 54

*U.S. v. Pirro*, 212 F.3d 86 (CA2 2000) .......................... 27, 28, 31

*U.S. v. Quinones*, 511 F.3d 289 (CA2 2007) ............................... 53

*U.S. v. Rosen*, 716 F.3d 691 (CA2 2013) ............................. 15, 25

*U.S. v. Ruiz*, 536 U.S. 622 (2002) .................................. 45, 46

*U.S. v. Savin*, No. 00-cr-45(RWS), 2001 WL 243533 (SDNY Mar. 7, 2001) ......................................................................... 41

*U.S. v. Silver*, 864 F.3d 102 (CA2 2017), *cert. pending*, No. 17-562 (Oct. 11, 2017) ................................................................... *passim*

*U.S. v. Skelos*, Nos. 16-1618-cr, 16-1697-cr, __ F. App'x __, 2017 WL 4250021 (CA2 Sept. 26, 2017) ............................... 6, 9, 18, 22

*U.S. v. Smith*, 985 F. Supp. 2d 547 (SDNY 2014), *aff'd, U.S. v. Halloran*, 664 F. App'x 23 (CA2 2016), *cert. denied, Smith v. U.S.*, No. 16-916, __ S. Ct. __, 2017 WL 319383 (Oct. 2, 2017) ............................... 29

*U.S. v. Stringer*, 730 F.3d 120 (CA2 2013) .............................. 28

*U.S. v. Sun-Diamond Growers of Calif.*, 526 U.S. 398 (1999) ......................................................... 10, 16, 17, 19

*U.S. v. Tavares*, 844 F.3d 46 (CA1 2016) ................................ 19

*U.S. v. Tuzman*, No. 15-cr-536(PGG), 2017 WL 4785459 (SDNY Oct. 19, 2017) ................................................................... 41

*U.S. v. Upton*, 856 F. Supp. 727 (EDNY 1994) ....................... 43, 53

*U.S. v. Vilar*, 530 F. Supp. 2d 616 (SDNY 2008) .................... 43, 44

*U.S. v. Walsh*, 194 F.3d 37 (CA2 1999) ............................. 36, 38

*U.S. v. Woodward*, Crim. No. 95-10234-DPW, Civ. No. 17-12036-DPW, 2017 WL 4684000 (D. Mass. Nov. 3, 2017) .............................. 21

*Villasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310 (N.D. Ill. 1996) ........ 14

*Webster v. Fall*, 266 U.S. 507 (1925) ........ 22

*Zafiro v. U.S.*, 506 U.S. 534 (1993) ........ 47

**Statutes and Rules**

18 U.S.C. § 201 ........ 6, 16-18

18 U.S.C. § 371 ........ 3, 26

18 U.S.C. § 666 ........ *passim*

18 U.S.C. § 1343 ........ 3, 26

18 U.S.C. § 1346 ........ 3, 6, 18, 26

18 U.S.C. § 1349 ........ 3, 26

18 U.S.C. § 1951 ........ 18, 24

Fed. R. Crim. P. 6 ........ 34

Fed. R. Crim. P. 7 ........ 2, 27, 36-37

Fed. R. Crim. P. 8 ........ 49

Fed. R. Crim. P. 12 ........ 1, 25

Fed. R. Crim. P. 14 ........ 2, 47, 49

Fed. R. Crim. P. 16 ........ 42

Fed R. Evid. 104 ........ 44

**Other Authorities**

Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse*, 84 Fordham L. Rev. 463 (2015) ........ 5, 10

Dan Corey, *Since Weinstein, Here's a List of Men Accused of Sexual Misconduct*, NBC NEWS (Nov. 11, 2017), https://www.nbcnews.com/storyline/harvey-weinstein-scandal/weinstein-here-s-growing-list-men-accused-sexual-misconduct-n8165466 ........ 51

Derek Thompson*, Mass Shootings in America Are Spreading Like a Disease*, THE ATLANTIC (Nov. 6, 2017), https://www.theatlantic.com/health/archive/2017/11/americas-mass-shooting-epidemic-contagious/545078/ ................................................. 50

Gillian B. White*, America's Sexual-Assault Epidemic*, THE ATLANTIC (Oct. 21, 2017), https://www.theatlantic.com/business/archive/2017/10/weinstein-sexual-assault/543582/ ................................................. 51

Harvey A. Silvergate & Emma Quinn-Judge, *Tawdry or Corrupt? McDonnell Fails to Draw a Clear Line for Federal Prosecution of State Officials*, 2016 Cato Sup. Ct. Rev. 189 (2016) ................................................. 9, 21

Juhu Thukral and Melissa Ditmore, *Revolving Door: An Analysis of Street-Based Prostitution in New York City*, URBAN JUSTICE CENTER (2003) available at http://sexworkersproject.org/downloads/RevolvingDoor.pdf ................................................. 52

Martin Flumenbaum & Brad S. Karp, *Defining the Scope of 'McDonnell v. United States,'* NYLJ 2 (Oct. 24, 2017) ................................................. 7, 18

Max Fisher and Josh Keller, *What Explains U.S. Mass Shootings? International Comparisons Suggest an Answer*, NY TIMES (Nov. 7, 2017), https://nyti.ms/2hODjP5 ................................................. 50

Robert L. Kelly, *The Tech Side of E-Discovery: Understanding Electronically Stored Information*, Business Law Today, Vol. 17, No. 1 (Sept./Oct. 2007), available at http://apps.americanbar.org/buslaw/blt/2007-09-10/kelly.shtml ................................................. 43

NYPD Mission, http://www1.nyc.gov/site/nypd/about/about-nypd/mission.page (last visited Nov. 8, 2017) ................................................. 32, 50

Data Volume Estimates and Conversions, SDS DISCOVERY, http://sdsdiscovery.com/resources/data-conversions/sds (last visited Nov. 8, 2017) ................................................. 43

Pet. Br., *McDonnell v. U.S.*, No. 15-474, 2016 WL 825553, at *54 (U.S. filed Feb. 24, 2016) ................................................. 7

Br. for Def.-App. Dean Skelos in *U.S. v. Skelos*, Nos. 16-1618(L), -1697(CON), 2016 WL 5929119 (CA2 filed Oct. 7, 2016) ........................... 22

Br. for Def.-App. Adam Skelos in *U.S. v. Skelos*, Nos. 16-1618(L), -1697(CON), 2016 WL 5929120 (filed Oct. 7, 2016) ........................... 22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**---------------------------------------------------------------X**

**UNITED STATES OF AMERICA**

      **-v.-**                         **16-CR-468 (GHW)**

**JAMES GRANT, *et al.*,**

                     ***Defendants.***
**---------------------------------------------------------------X**

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANT MICHAEL HARRINGTON'S PRETRIAL MOTIONS</u>

## <u>STATEMENT</u>

Michael Harrington respectfully moves this Court for an order granting multiple relief, as follows:

1.  Dismissing the indictment, per Fed. R. Crim. P. 12(b)(3)(B), for asserting a stream of benefits bribery theory eradicated by *McDonnell v. U.S.*, 136 S. Ct. 2355 (2016);

2.  Dismissing the indictment, per Fed. R. Crim. P. 12(b)(3)(B), for failing to describe the alleged criminal conduct with sufficient specificity and failing to state an offense;

3.  Dismissing Counts Four through Seven, per Fed. R. Crim. P. 12(b)(3)(B), to the extent they charge illegal gratuities;

4. Directing the government to produce the grand jury instructions for *in camera* review to ensure *McDonnell* compliance;

5. Directing the government, per Fed. R. Crim. P. 7(f), to provide a limited bill of particulars;

6. Directing the government to identify the documents and tapes it seeks to introduce at trial;

7. Directing the government – per the Sixth Amendment, *Brady v. Md.*, 373 U.S. 83 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972), and associated cases – to immediately produce all exculpatory and impeachment information in its possession, custody or control;

8. Severing Harrington's trial, per Fed. R. Crim. P. 14(a), from that of his codefendants;

9. Joining Harrington in all applicable codefendant motions not inconsistent with his; and

10. Granting any other relief the Court deems appropriate.

# BACKGROUND

Harrington and codefendant James Grant, high-ranking New York City police officers, stand accused of exchanging "official favors" for personal and financial benefits from codefendant Jeremy Reichberg and a cooperating witness "on an as-needed basis" over a multi-year period, "as opportunities arose." *See* Indictment ¶¶ 3, 5-7, 11, 13, 15, 20, 21, 26.

Specifically, Harrington is charged with conspiring to commit honest services wire fraud in violation of 18 U.S.C. § 1349 (Count One); honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346 (Count Two); conspiring to pay and receive bribes and gratuities in violation of 18 U.S.C. § 371 (Count Four); and receiving bribes and gratuities in violation of 18 U.S.C. § 666 (Count Six).

Examples of personal and financial benefits that Harrington allegedly received from Reichberg and CW-1 include: "(a) obtaining thousands of dollars in work for a security company, which Harrington unofficially helped manage, and which was run in part by Harrington's family; (b) hotel accommodations for Harrington and family members in Chicago, Illinois; (c) expensive lunches and dinners; (d) prime tickets to

numerous sporting events; and (e) a video game system for Harrington's children." *Id.* ¶ 10.

Examples of official acts that Harrington allegedly performed to benefit Reichberg and the cooperating witness include: "(a) providing police escorts; (b) providing official NYPD assistance with private disputes and investigations; (c) providing police resources for security at religious sites and events; and (d) providing special access to parades and other cultural events." *Id.* ¶ 11.

## ARGUMENT

## POINT I

### THE INDICTMENT MUST BE DISMISSED BECAUSE THE BRIBERY THEORY IT ALLEGES – SOUNDING IN AN AGREEMENT TO TAKE OFFICIAL ACTION "AS-NEEDED" AND "AS OPPORTUNITIES AROSE" – HAS BEEN ABOLISHED BY *MCDONNELL V. U.S.*

## A.   STATEMENT

The indictment in this case attempts to invoke the so-called "stream of benefits" theory of bribery. *E.g., U.S. v. Kemp*, 500 F.3d 257, 281 (CA3 2007). Under that theory, bribery occurs when "a government official receive[s] a benefit in exchange for his promise to perform" unspecified "official acts" as future "opportunities arise" – with no "direct link"

between "a benefit received and a specifically identified official act." *U.S. v. Ganim*, 510 F.3d 134, 141-42 (CA2 2007) (footnote omitted); *compare* Indictment ¶ 5 (charging that defendant Reichberg provided defendants Grant and Harrington with "personal and financial benefits" in exchange for "official action[] as opportunities arose," enabling Reichberg to obtain "official benefits on an as-needed basis").

The theory is controversial, effectively conflating bribes and gratuities and arguably making it easier to prove the first than the second. *E.g.*, Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse*, 84 Fordham L. Rev. 463, 463 (2015) ("Alschuler") (cautioning against stream of benefits theory "degenerat[ing]" into a bare "'one hand washes the other' or 'favoritism' standard"). That's a puzzling result, as bribery is a more serious crime requiring evidence of a corrupt quid pro quo arrangement – an element lacking in the payment of gratuities, a lesser offense akin to rewarding official misconduct. *E.g.*, *Ganim*, 510 F.3d at 146-47 (promise to exchange act for benefit – i.e., quid pro quo agreement – "distinguishes" bribe from gratuity).

Though our circuit court and others formerly endorsed the stream of benefits theory, the Supreme Court has never expressly addressed or adopted it. And in a marquee ruling issued last June, *McDonnell v. U.S.*, the Court bluntly repudiated the theory's underlying rationale, demanding the indictment's dismissal. 136 S. Ct. 2355 (2016); *e.g.*, *U.S. v. Emmenegger*, 329 F. Supp. 2d 416, 429 (SDNY 2004) (Lynch, J.) (district court may disregard circuit precedent when subsequent Supreme Court decision so "undermines" its conceptual underpinnings "that it will almost inevitably be overruled").

## B.  *MCDONNELL* EVISCERATES THE STREAM OF BENEFITS THEORY

In *McDonnell*, the high court famously voided an ex-Virginia governor's corruption conviction, holding that politics as usual – merely "setting up a meeting, calling another public official, or hosting an event" – doesn't alone qualify as an "'official act'" under the bribery (18 U.S.C. § 201), honest services fraud (18 U.S.C. § 1346) and extortion (18 U.S.C. § 1951) laws. 136 S. Ct. at 2368.[1] The Court based that conclusion on

---

[1] The parties in *McDonnell* agreed to define honest services fraud and Hobbs Act extortion by reference to § 201's definition of "official act." 136 S. Ct. at 2365. The Second Circuit has since clarified, however, that *McDonnell*'s holding applies equally to the honest services and federal program bribery (18 U.S.C. § 666) violations alleged here, *U.S. v. Boyland*, 862 F.3d 279, 290-91 (CA2 2017); *U.S. v. Skelos*, Nos. 16-1618-

statutory construction, its own "precedent" and "significant constitutional concerns" – rooted in overcriminalization, vagueness and federalism – attending the government's "boundless interpretation" of the term "'official act.'" *Id.* at 2367-68, 2372-73, 2375. Along the way, the Court offered pointed analysis impugning the stream theory's validity.

### 1.    *McDonnell*'s Guidance Relative to Stream of Benefits

Notably, McDonnell himself was charged with stream of benefits bribery,[2] though he didn't explicitly contest the theory's legitimacy before the high court.[3] *But see* Pet. Br., *McDonnell v. U.S.*, No. 15-474, 2016 WL 825553, at *54 (U.S. filed Feb. 24, 2016). But in sustaining the challenge McDonnell did level – that the routine political courtesies he extended didn't rise to "official acts" imposing criminal liability – the Court left no doubt that the theory is doctrinally suspect. Among a raft of pronouncements eroding the theory's core premises, the Court said this:

---

cr, 16-1697-cr, __ F. App'x __, 2017 WL 4250021, at *2 (CA2 Sept. 26, 2017) – at least where "official acts form the basis of public corruption charges." Martin Flumenbaum & Brad S. Karp, *Defining the Scope of 'McDonnell v. United States,'* NYLJ 2 (Oct. 24, 2017) ("*Defining*"); *cf. U.S. v. Silver*, 864 F.3d 102, 116 n.67 (CA2 2017), *cert. pending*, No. 17-562 (Oct. 11, 2017).

[2] *McDonnell*, 135 S. Ct. at 2364-65 (Governor accused of accepting illicit benefits in return for "performing official actions on an as-needed basis, as opportunities arose") (citation and internal quotation marks omitted).

[3] He did so in district court. *Ibid.* at 2367 (quoting 64 F. Supp. 3d 783, 787 (E.D. Va. 2014)).

**First** and foremost, "the offense" of bribery "is completed at the time when [a] public official receives a payment in return for his *agreement* to perform specific official acts." *Id.* at 2365 (quoting *U.S. v. Evans*, 504 U.S. 255, 268 (1992)) (emphasis supplied).

**Second**, and equally telling, the acts the official agrees to perform must not only be "specific," but also "focused and concrete," involving a "formal exercise of governmental power." *McDonnell*, 136 S. Ct. at 2368, 2369-70, 2371-72, 2374. Even more precisely, an official act is "something … relatively circumscribed – the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2359. In short, it must be of the "same stripe" as – or "similar in nature" to – a "lawsuit before a court," an "administrative determination" before an "agency" or a "hearing before a committee." *Id.* at 2368-70, 2372.

**Third**, and perhaps most striking, defining official acts to include acts taken "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end" – the stream of benefits theory in microcosm[4] – "lack[s] important qualifications" and is "significantly

---

[4] *See McDonnell*, 64 F. Supp. 3d at 792-93 (describing these instructions as paraphrasing *Ganim*'s "teaching[] that bribery can be accomplished through an ongoing course of conduct," comprising "official acts" performed "on an as-needed

overinclusive." *Id.* at 2373-74; *see Skelos*, 2017 WL 4250021, at *1 (recognizing that *McDonnell* "held such language deficient"). Instead, the Court repeated for emphasis, an official act must "involv[e]" a "specific[,] focused" and "formal exercise of governmental power." *McDonnell*, 136 S. Ct. at 2374.

As applied here, these precepts collectively require that a public official promise ex ante – i.e., at the time the corrupt agreement is made – to take specific, formal, focused, concrete action that's equivalent to a lawsuit, an agency determination or a committee hearing. Conversely, merely pledging to take acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end," without more, does not count as official action and fails to establish criminal bribery. *Id.* at 2373-74.

## 2.   The Stream of Benefits Theory Is Incompatible with *McDonnell* and Doesn't Survive It

On any plausible reading, *McDonnell* unmistakably assails the stream theory's logical predicates. *E.g.*, Harvey A. Silvergate & Emma Quinn-Judge, *Tawdry or Corrupt?* McDonnell *Fails to Draw a Clear Line*

---

basis") (citations and internal quotes omitted), *aff'd*, 792 F.3d 478 (CA4 2015), *rev'd*, 136 S. Ct. 2355.

*for Federal Prosecution of State Officials*, 2016 Cato Sup. Ct. Rev. 189, 207 (2016) ("*Tawdry*") (suggesting that *McDonnell* "silently rejected the stream of benefits theory"); Alschuler, 84 Fordham L. Rev. at 480 (arguing that *Evans*'s "specific official acts" language and the "some particular official act" that *U.S. v. Sun-Diamond Growers of Calif.*[5] requires – both featured prominently in *McDonnell* – conflict with stream theory).

In requiring a promise to perform "specific official acts" at the time the quid pro quo agreement is made, *McDonnell* plainly contemplates that the acts to be performed will be "identified" in advance, upon the agreement's consummation. 136 S. Ct. at 2365, 2371 (jury ultimately must decide if "public official agreed to perform an 'official act' *at the time of* the alleged quid pro quo") (emphasis supplied and omitted), 2374. Otherwise it would be impossible to determine whether the acts promised are sufficiently concrete, formal and focused to qualify as official under *McDonnell*'s strict definition, and thus whether the parties truly agreed to commit bribery. And as *McDonnell* emphatically reaffirms, the agreement – not its execution – marks the crime's completion. *Id.* at 2365.

---

[5] 526 U.S. 398, 406 (1999).

On the other hand, the stream theory asserts that "the specific act to be performed" need *not* be "identified at the time of the promise," and that "particular bribes" need *not* be "linked" to "particular official acts" at "the time of the corrupt agreement." *Ganim*, 510 F.3d at 147. Rather, it's enough that the official agree to perform some "unspecified[] official act" if and as "opportunities arise," at any time off in the "future." *Id.* at 141-42 (footnote omitted). Those suppositions defy *McDonnell*'s requirement of a specific, focused, concrete and formal act identified at the time the agreement's struck, rendering the two approaches flatly contradictory. *Cf. Silver*, 864 F.3d at 118 (caveat that legislator must have "intended" to corruptly "exercise official influence or make official decisions … *as specific opportunities arose*" failed to "salvage" official acts instruction held defective after *McDonnell*) (footnote, citation and internal quotation marks omitted). After all, *McDonnell* makes it abundantly clear that the central issue is what an official "agreed to do *at the time* he accepted" undisclosed "gifts." 135 S. Ct. at 2374 (emphasis supplied).

The chart below graphically illustrates the dichotomy. It contrasts the stream theory's key tenets – as enunciated in the Second Circuit's

11

leading public corruption case, *Ganim* – with what *McDonnell* said about

them.

| Stream Theory Assumption | *McDonnell* Rejoinder |
|---|---|
| A "government official's promise to perform a *future*, but *unspecified*, official act is sufficient to demonstrate the requisite quid pro quo for a conviction." *Ganim*, 510 F.3d at 141-42 (emphasis supplied) (footnote omitted). | • Official act must be "*specific*," "focused and concrete," involving a "formal exercise of governmental power." *McDonnell*, 136 S. Ct. at 2368, 2369-70, 2371-72, 2374 (emphasis supplied).<br><br>• Recipient must "*agree*[] to perform" an act qualifying as official "*at the time of the alleged quid pro quo.*" *Id.* at 2371 (emphasis supplied).<br><br>• Offense complete "*at the time*" public official paid for "*agree[ing]* to perform *specific* official acts." *Id.* at 2365 (citation and internal quotes omitted) (emphasis supplied). |
| Government "need not" prove "specific act to be performed was *identified* **at the time of the promise**." *Id.* at 147 (emphasis supplied). | Defendant must "*agree*[]" to make decision or take action on "*identified* 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 2375 (emphasis supplied). |

| | |
|---|---|
| "[P]articular bribes" need not be "linked at the time of the corrupt agreement to particular official acts" where "payment is *one of a series* to ensure an *ongoing commitment* to perform acts to *further* the payor's interests." *Id.* at 147 (emphasis supplied). | Defining official acts to include acts taken "*in furtherance of longer-term goals*" or "*in a series of steps* to exercise influence or achieve an end" lacks "important qualifications" and is "significantly overinclusive." *Id.* at 2373-74 (emphasis supplied). |

As the chart indicates, *Ganim* and *McDonnell* use parallel language to express similar ideas, yet sharply diverge as to whether those ideas coalesce to state a cognizable claim of criminal bribery. Given their starkly different conclusions on that score, there is no escaping that the *McDonnell* court consciously dismantled the stream theory's conceptual framework, cutting it off at the knees and consigning it to extinction. These defendants should not be forced to run the gauntlet of a long, costly and debilitating criminal trial on a discredited theory that "will almost inevitably be overruled." *Fernandez v. Johnson*, No. 12 Civ. 2774 (LBS), 2013 WL 796542, at *3 (SDNY Mar. 5, 2013) (quoting *Emmenegger*, 329 F. Supp. 2d at 429); *see, e.g.*, *Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*, No. 1:11–CV–01074, 2011 WL 4005396, at *2 (N.D. Ohio Sept. 8, 2011) (district court bound by circuit "precedent unless the Supreme Court reverses or *undermines* it") (emphasis supplied);

13

*Villasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310, 313 (N.D. Ill. 1996) (district court bound by circuit "precedent unless and until a subsequent decision by that court or the Supreme Court undermines its holding").

## C.   *GANIM* IS ANALYTICALLY FLAWED EVEN ON ITS OWN TERMS

If it doesn't vitiate the stream theory outright – and it does – *McDonnell* at least crystallizes that *Ganim*, the case formally enshrining the theory in our circuit, was wrongly decided to begin with and calls for reexamination.

**First**, *Ganim* deemed the stream theory's crux – "it is sufficient if the public official understands that he … is expected … to exercise … influence" on the payor's behalf "as specific opportunities arose" – a "natural corollary of *Evans*' pronouncement that the government need not prove the existence of an *explicit* agreement at the time a payment is received." 510 F.3d at 144-45 (emphasis supplied) (citations and internal quotes omitted). In fact, *Evans* took care to note that an official must "agree[]" at the time of "payment" to perform "*specific* official acts." 504 U.S. at 268 (emphasis supplied). In suggesting otherwise, *Ganim* confuses *Evans*'s recognition that an *explicit* bribery agreement is

14

generally unnecessary for a holding that a public official need not agree to perform a *specific* official act. That mixes apples and oranges. An **explicit** *agreement* is distinct from a **specific** *act*. And a person obviously may agree *implicitly* to do something specific.

Properly read, *Evans* merely clarified that proof of an explicit bribery agreement is unnecessary when "payments are made in the form of campaign contributions." *Ganim*, 510 F.3d at 142. *Evans* thereby limited *McCormick v. U.S.*[6] – which required an "express promise" to accommodate First Amendment concerns arising in that "special context" – to its facts. *Id.*; *see U.S. v. Rosen*, 716 F.3d 691, 701 (CA2 2013) (*McCormick* requires "express promise" in "unique context of campaign contributions"). But it doesn't logically follow, as *Ganim* decreed without citation or explanation, that a "specific act" need not be "identified … at the time the benefit is received." *Id.* at 145.

Consider, for example, a city councilor on a zoning committee who requests from a real estate developer with a project before the committee an interest-free tuition loan for the councilor's college-aged child. "No guarantees," the councilor tells the developer with a wink and a nod, "but

---

[6] 500 U.S. 257 (1991).

if you help me with the loan, I think there's a pretty good chance your project gets approved."

In that scenario, a jury could find that the councilor *implicitly* agreed to accept a payment in return for performing a *specific* official act – using the councilor's position and influence to push the developer's project through the zoning committee. That's precisely why *Evans* held that a bribery "agreement" outside the campaign contribution context need not be explicit, but still must contemplate "at the time" of "payment" the performance of "*specific* official acts," 504 U.S. at 268 (emphasis supplied) – a holding that *McDonnell* echoes and expands.

**Second**, *Ganim* limited the Supreme Court's 1999 *Sun-Diamond* ruling to gratuity offenses under 18 U.S.C. § 201, excluding from the decision's reach bribery under that statute and associated anticorruption laws. *Sun-Diamond*, for its part, had required "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." 526 U.S. at 414; *see also id.* at 406 ("The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved."). In thus confining *Sun-Diamond*, the panel in *Ganim* brushed

aside a cogent argument that reading the case so narrowly allowed the government to convict a defendant of bribery "upon proof of a 'less exacting nexus' than it must [proffer] to demonstrate a gratuities offense, notwithstanding that extortion and bribery are far more serious crimes" with harsher "penalties." 510 F.3d at 146.

According to the *Ganim* panel, the justices had grounded *Sun-Diamond* in "the very text of the illegal gratuities statute" – specifically, the phrase "'for or because of *any official act*'" – and the need to "supply a limiting principle that would distinguish an illegal gratuity from a legal one." *Id.* (quoting *Sun-Diamond*, 526 U.S. at 406). And in the *Ganim* panel's view, "extortion [and] bribery" didn't necessitate a similar "limiting principle" because "the requirement of an intent to perform an act in exchange for a benefit – i.e., [a] quid pro quo agreement – []  distinguishes those crimes from both legal and illegal gratuities." *Ganim*, 510 F.3d at 146-47 (citation omitted).

But that logic clashes with *McDonnell*, which imported § 201's definition of "official act" – the operative term in *Ganim* – into all the antibribery laws at issue here. *See ante* n.1 and sources cited. Indeed, it

17

did so *precisely* "to supply a limiting principle"[7] that would dispel "significant constitutional concerns" (tied to overcriminalization, vagueness and federalism) surrounding the government's "expansive interpretation" of the term – the very reason waved off in *Ganim*. *McDonnell*, 136 S. Ct. at 2372; *see, e.g., Skelos*, 2017 WL 4250021, at *1-*2 & n.1 (overbroad official act charge on Hobbs Act extortion and federal program bribery implicated same "'constitutional concerns'" raised in *McDonnell*) (quoting 136 S. Ct. at 2372); *Silver*, 864 F.3d at 116 n.67 (recognizing that *McDonnell*'s exacting gloss on "official act" springs largely from "constitutional concerns"); *Boyland*, 862 F.3d at 290-91 ("in addition to considering Congressional intent, the Court's analysis turned upon constitutional concerns" – equally applicable to honest services fraud and Hobbs Act extortion – "stemming from the breadth of the interpretation advanced by the government") (citing *McDonnell*, 136 S. Ct. at 2372-73); *Defining*, NYLJ 3 ("When § 666 is charged in the same terms as 18 U.S.C. §§ 201, 1951, and 1346, it likely touches on the same constitutional concerns.").

---

[7] *Ganim*, 510 F.3d at 146.

At any rate, suggesting that bribery needs no "limiting principle" because its quid pro quo requirement already supplies one, *Ganim*, 510 F.3d at 146-47, is circular on its face. For in holding that requirement satisfied so long as an official understands he's expected to exert influence on the payor's behalf as opportunities arise, *id.* at 144, *Ganim* dilutes it to the vanishing point, conflating bribes and gratuities if not making bribery the easier crime to prove. *See ante* 5. In other words, the *Ganim* approach effectively criminalizes the conferral of benefits to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *U.S. v. Tavares*, 844 F.3d 46, 55 (CA1 2016)) (quoting *Sun-Diamond*, 526 U.S. at 406). And that sort of showing "is not sufficient" to establish even "an illegal gratuity," much less a prohibited bribe. *Id.* at 58 (citing *Sun-Diamond*, 526 U.S. at 405-08).

**Third**, *Ganim* similarly opines that the quid pro quo requirement "ensures that a particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future." *Id.* at 147. But that assertion also begs the question. If the acts to be performed aren't identified at the time of payment, it's impossible to

19

determine whether the recipient has agreed to do something official –
specific, focused, formal and concrete, akin to a lawsuit, agency ruling or
committee hearing – within *McDonnell*'s ambit.

**Fourth**, and finally, *Ganim* would permit a bribery finding where
a given "payment is one of a series to ensure an ongoing commitment to
perform acts to further the payor's interests." *Id.* But *McDonnell* squarely
disavowed that proposition, holding "significantly overinclusive" and
lacking "important qualifications" instructions defining official acts as
acts taken "*in furtherance of longer-term goals*" or "*in a series of steps* to
exercise influence or achieve an end." 136 S. Ct. at 2373-74 (emphasis
supplied).

For all these reasons, *Ganim* is dubious authority that's ripe for
reexamination – both in its own right and surely after *McDonnell*.

## D.    THE    GOVERNMENT'S    PROBABLE    RETORTS    ARE UNAVAILING

Lastly, the government's likely efforts to rescue the stream of
benefits theory come up short.

**First**, the government may seize on a solitary sentence in
*McDonnell* to argue that identifying acts to be taken in advance
improperly requires that a public official "specify the means [] he will use

to perform his end of the bargain." *U.S. v. Woodward*, Crim. No. 95-
10234-DPW, Civ. No. 17-12036-DPW, 2017 WL 4684000, at *8 (D. Mass.
Nov. 3, 2017) (quoting *McDonnell*, 136 S. Ct. at 2371) (footnote omitted).
Not true. As the Second Circuit recognized even before *McDonnell*, the
"[a]cts" to be taken – what a public official promises to do – "constitute"
the very "agreement" the law forbids, defining its essential nature. *U.S.
v. Bruno*, 661 F.3d 733, 744 (CA2 2011). And as *McDonnell* roundly
reaffirms, a corrupt agreement is bribery's main ingredient – the heart
of the crime, not just a means of carrying it out. 136 S. Ct. at 2365 (offense
complete when "public official receives a payment in return for his
agreement to perform specific official acts") (quoting *Evans*, 504 U.S. at
268).

"Thus, although the 'means' need not be specified" post-*McDonnell*,
"it appears that 'an' official act must be specified." *Tawdry*, 2016 Cato
Sup. Ct. Rev. at 208. To illustrate, recall our earlier hypothetical
involving the city councilor on the zoning committee and the real estate
developer with a project coming before it. In that scenario, as mentioned,
a jury could find that the councilor agreed to perform a specific official
act – namely, using the councilor's position and influence to push the

developer's project through the committee. At the same time, the councilor left open the steps he would take to accomplish that act and fulfill his promise — i.e., precisely *how* the councilor would use his position and influence to move the developer's project. That's an example of *McDonnell* at work. Our hypothetical councilor has agreed to perform a specific official act without specifying the means of performance.

**Second**, the government may note that the *Skelos* court applied stream of benefits "principles" after *McDonnell* to "conclude" that the evidence there was "sufficient to establish a *quid pro quo* arrangement." 2017 WL 4250021, at *3. But the Skeloses didn't challenge the theory's continued viability,[8] so the issue wasn't before, considered or addressed by the court in reaching that conclusion. And "[q]uestions" that "merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

---

[8] *See* Br. for Def.-App. Dean Skelos in *U.S. v. Skelos*, Nos. 16-1618(L), -1697(CON), 2016 WL 5929119 (CA2 filed Oct. 7, 2016); Br. for Def.-App. Adam Skelos in *ibid.*, 2016 WL 5929120 (filed Oct. 7, 2016).

**Third**, the government may point out that a district judge in New Jersey recently rebuffed a similar attack on the stream theory in the high-profile corruption trial of Sen. Robert Menendez. *See U.S. v. Menendez, et al.*, No. 15-CR-155 (WHW) (D. N.J.). The gist of the judge's ruling, delivered orally from the bench, was this: 'That the official acts ultimately taken by the public official must be specific and focused under McDo[nn]ell in no way imposed the requirement that they be precisely identified at the time the agreement was made." *Id.*, 10/16/17 Tr. 43.

That assessment is too superficial. As already explained, a corrupt "agreement" – Judge Walls's word – is the thrust of any bribery offense. And the trier can't determine if a payee agreed to perform an act meeting *McDonnell*'s definition of official – something specific, concrete, focused and formal, tantamount to a lawsuit, an agency ruling or a committee hearing – unless the act is identified at the time the agreement's reached.

That is especially true because "fulfillment of the *quid pro quo* is not an element of the offense," *Evans*, 504 U.S. at 268, and "the crime of extortion occurs without regard to whether the promised official act is carried out." *Ganim*, 510 F.3d at 145. Rather, the "agreement" completes the offense, *Evans*, 504 U.S. at 268 – even if the official never follows

through or even intends to follow through on what he pledges or threatens. *Id.* at 274 (Kennedy, J., concurring) ("a public official violates § 1951 if he *intends the payor to believe* that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied. … The inducement from the official is criminal … so long as he intends it to be so and the payor so interprets it.") (emphasis supplied).

E.    <u>**CONCLUSION**</u>

Agreeing to exchange official acts for things of value is the essence of criminal bribery. And *McDonnell* limits official acts to specific, concrete, focused and formal exercises of government power, comparable to lawsuits, agency determinations or committee hearings. Since the agreement completes the offense – whether or not executed or intended to be executed – those propositions dictate that an official agree to commit an act that's specific, concrete, focused and formal. In turn, a specific, concrete, focused and formal act necessarily connotes something that's identified in advance, at the time of payment.

Together, those requirements hopelessly confound the stream of benefits theory of bribery, which punishes an "ongoing course of conduct" whereby benefits are exchanged for a "pattern" of acts "favorable to the donor," *Ganim*, 510 F.3d at 149 (citation and internal quotes omitted) – even if the benefit "is *not* exchanged for a particular act" and "'the opportunity to undertake [it] has *not* arisen.'" *Rosen*, 716 F.3d at 700 (CA2 2013) (quoting *Ganim*, 510 F.3d at 147) (emphasis supplied). For this reason, and because *McDonnell* expressly rebuked instructions capturing the stream theory's core,[9] the pending indictment resting on that theory fails to charge a cognizable crime and must be dismissed.

## POINT II

### THE INDICTMENT LACKS SUFFICIENT SPECIFICITY AND PLEADS NO COGNIZABLE OFFICIAL ACTS, FAILING TO CHARGE A CRIME

Harrington moves to dismiss all counts against him – Counts One, Two, Four and Six – per Fed. R. Crim. P. 12(b)(3)(B)(iii), (v) for failure to describe the alleged criminal conduct with sufficient specificity and failure to state an offense. *See U.S. v. Aleynikov*, 676 F.3d 71, 75-76 (CA2

---

[9] *See* 136 S. Ct. at 2373-74 (official acts defined as acts taken "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end").

2012) (indictment may be challenged pretrial "on the ground that it fails to allege a crime within the terms of the applicable statute").

Insofar as the indictment's factual assertions are insufficient to establish prima facie that Harrington performed or agreed to perform an "official act" under *McDonnell* – one involving a specific, focused and formal exercise of government power – it fails to state an offense and must be dismissed. *See Silver*, 864 F.3d at 119 (conduct that doesn't qualify as an official act under *McDonnell* is noncriminal).

## A. THE INDICTMENT

Harrington is charged with participating in a public corruption scheme in which he allegedly abused his position as a high-ranking NYPD officer, soliciting and accepting personal and financial benefits in exchange and as a reward for "official action."[10] *See* Indictment ¶¶ 3, 6, 11, 13, 15, 20, 21, 26; *see also id.* ¶5 (codefendant Reichberg bribed high-ranking police officials like Harrington to obtain "official benefits"); *id.* ¶7 (Harrington ready and willing to use his "official authority within the

---

[10] Specifically, Count One charges Harrington with conspiring to commit honest services wire fraud in violation of 18 U.S.C. § 1349; Count Two charges him with honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346; Count Four charges him with conspiring to pay and receive bribes and gratuities in violation of 18 U.S.C. § 371; and Count Six charges him with receiving bribes and gratuities in violation of 18 U.S.C. § 666.

NYPD to provide [coconspirators with] assistance," performing "official favors" for their benefit).

The indictment does not purport to identify all the "numerous official acts" that Harrington allegedly performed. *Id.* Instead, it offers a list of "examples" in connection with Count One: "a) providing police escorts; b) providing official NYPD assistance with private disputes and investigations; c) providing police resources for security at religious sites and events; and d) providing special access to parades and other cultural events." *Id.* No further detail is included as to the official acts ascribed to Harrington except that he allegedly "agreed to facilitate an arrest for Reichberg … by using the NYPD to arrest [a suspected criminal] when he was found" by a private security company. *Id.* ¶ 22(g).

## B.    LEGAL STANDARD

### 1.    Indictment Sufficiency

An indictment must provide a "plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), as the Fifth and Sixth Amendments so guarantee. *U.S. v. Pirro*, 212 F.3d 86, 91-92 (CA2 2000).

Ordinarily, an indictment is deemed "sufficient" if it "tracks the language of the statute charged and states the time and place (in approximate terms) of the alleged crime." *Id.* at 92-93 (internal citation and quotation omitted).

Certain crimes, however, require more: namely, "specification of how a particular element will be met (as opposed to categorical recitation of the element)" when "importan[t]" to the proceeding's "fairness." *U.S. v. Stringer*, 730 F.3d 120, 127 (CA2 2013).

Among those crimes are offenses defined in "generic terms," either by statute or at common law. *Pirro*, 212 F.3d at 93. To "fulfill the functions of notifying the defendant of the charges against him" and "assuring … he is tried on the matters considered by the grand jury," an indictment alleging a generic offense must "state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Id.*

Further, "when one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *Id* (internal citations and quotation omitted).

An indictment "that does not describe conduct that is a violation of the criminal statute charged" must be dismissed. *U.S. v. Smith*, 985 F. Supp. 2d 547, 561 (SDNY 2014) (internal citation and quotation omitted), *aff'd*, *U.S. v. Halloran*, 664 F. App'x 23 (CA2 2016), *cert. denied*, *Smith v. U.S.*, No. 16-916, __ S. Ct. __, 2017 WL 319383 (Oct. 2, 2017).

### 2. **"Official Acts"**

"Official action" is a term of art that does not encompass every action a public official customarily takes. *See McDonnell*, 136 S. Ct. at 2367-72.

Rather, as detailed in **POINT I**, an "official act" is "something specific and focused" – "a decision or action on a question, matter, cause, suit, proceeding or controversy" involving "a formal exercise of governmental power" that resembles "a lawsuit before a court, a determination before an agency or a hearing before a committee." *Id.* at 2371-72.

Recognizing that "[t]he basic compact underlying representative government *assumes* … public officials will hear from their constituents and act appropriately on their concerns," *McDonnell* took pains not to define "official action" in a way that chills public officials from addressing

29

"the most commonplace requests for assistance" or performing the most "prosaic" acts. *Id.* at 2372-73. "[S]etting up a meeting," for example, or "talking to another official" on a constituent's behalf "does *not* fit th[e] definition of 'official act.'" *Id.* at 2372 (emphasis supplied). Pedestrian activities like those, even *if* part of a quid pro quo arrangement, are not criminal. *See Silver* 864 F.3d at 119 (performance of nonofficial act is "not unlawful").

## C.  <u>ARGUMENT</u>

The indictment against Harrington must be dismissed because its factual assertions are insufficient to allege a specific and focused "official action" involving a formal exercise of government power.

To start, simply reciting statutory language to make out the elements of a corruption crime is inappropriate given *McDonnell*'s aversion to prosecuting public officials "for the most [mundane] interactions." 136 S. Ct. at 2373.

Where "official action" is alleged, then, the indictment must employ more than the generic term; it must describe "a particular criminal act, rather than a type of crime" to ensure that: a) the defendant receives proper notice of the charges against him; b) he is tried for conduct

actually considered by the grand jury; and c) the charged conduct actually *qualifies* as an official act. *Pirro*, 212 F.3d at 92-93; *see Silver*, 864 F.3d at 119 (broad, generic terms alone – "'public duties,' 'official influence,' and 'official decisions'" – cannot adequately "convey" that the charged conduct will "qualify as an official act"; more "specificity" needed).

To the extent the indictment charges Harrington with official acts not specifically identified, it therefore must be dismissed. The government should not be permitted to argue at trial that Harrington committed any official act other than the examples given in Count One: "a) providing police escorts; b) providing official NYPD assistance with private disputes and investigations; c) providing police resources for security at religious sites and events; and d) providing special access to parades and other cultural events." Indictment ¶ 11.

More fundamentally, to allege an "official act" with "requisite specificity," the indictment must assert facts connoting a "formal exercise of governmental power" that's concrete and "focused like a hearing or lawsuit." *Silver*, 864 F.3d at 119. Yet no attempt is made to show how any of the ¶ 11 examples even approach that threshold.

No attempt is made, for example, to explain how "providing a police escort[]" involves a "formal" decision-making process "of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 136 S. Ct. at 2369. In fact, the indictment contains no information at all – not even an inkling – about *how* police escorts are "provided." For all we know the grand jury evidence demonstrated assignment on an *in*formal, ad hoc basis. Alternatively, escort approvals may be too "prosaic" or "perfunctory" for criminal liability to attach. *Cf. Silver*, 864 F.3d at 121, 123.

Indeed, many of the indictment's "examples" appear facially *non*official – acts of the very stripe *McDonnell* strove *not* to criminalize. Providing escorts, say, or security resources at religious sites and events seems redolent of the "prosaic" actions that "conscientious" officials routinely undertake in addressing "legitimate" public "concerns" and "commonplace requests for assistance." *McDonnell*, 136 S. Ct. at 2372-73. That is particularly true since Harrington was a police officer charged with maintaining public order and protecting the citizens of New York City. *See* NYPD Mission, http://www1.nyc.gov/site/nypd/about/about-nypd/mission.page (last visited Nov. 8, 2017) ("The mission of the New

York City Police Department is to enforce the law, preserve peace, reduce fear and maintain order.").

*McDonnell* pointedly declined to set local standards of good government that might deter public officials from interacting with the people they serve, ultimately inhibiting the performance of their duties. 136 S. Ct. at 2372-73. Yet to suggest it is somehow criminal for the NYPD to arrest a criminal caught in the act or patrol a house of worship would do just that. Indictment ¶¶ 11, 22(g).

## D.    CONCLUSION

Because it asserts no facts indicating that any of the listed "examples" qualifies as an official act under *McDonnell*, the indictment against Harrington fails to state an offense and must be dismissed.

## POINT III

### COUNTS FOUR THROUGH SEVEN MUST BE DISMISSED TO THE EXTENT THEY CHARGE ILLEGAL GRATUITIES

Though circuit precedent currently forecloses it, *Ganim*, 510 F.3d at 150, defendants preserve for potential higher review the claim that the federal program bribery statute, 18 U.S.C. § 666, doesn't cover gratuities. *E.g., U.S. v. Fernandez*, 722 F.3d 1, 25-26 (CA1 2013). Having

nonetheless "agreed" before the *Ganim* panel "to prosecute violations of the statute as bribery only," 510 F.3d at 150, the government is estopped in any event from pursuing counts Four through Seven under a gratuity theory. *E.g.*, *U.S. v. Levasseur*, 846 F.2d 786, 792, 794-95 (CA1 1988) (doctrine of judicial estoppel – precluding party from "asserting a position in one legal proceeding which is contrary to a position it has already asserted in another" – may apply against government in criminal case when it "play[s] 'fast and loose'" with the courts).

## POINT IV

## THE COURT SHOULD INSPECT THE GRAND JURY INSTRUCTIONS *IN CAMERA*

Grand jury "matter[s]" are discoverable when a "ground may exist to dismiss the indictment because of a matter" that tainted the proceedings, Fed. R. Crim. P. 6(e)(3)(E)(ii) – including faulty "legal instructions." *U.S. v. Jailall*, No. 00 CR 69 (RWS), 2000 WL 1368055, at *2 (SDNY Sept. 20, 2000). Though prosecutors need not instruct the grand jury at all, *U.S. v. Lopez-Lopez*, 282 F.3d 1, 9 (CA1 2012), what instruction they do give must be accurate – not incomplete or erroneous. *U.S. v. Brito*, 907 F.2d 392, 394 (CA2 1990), *U.S. v. Kasper*, No. 10 CR 318 (HBS), 2011 WL 7098042, at *7 (WDNY June 20, 2011). Courts

release grand jury minutes, again including any instructions issued, upon a showing of "'particularized need.'" *U.S. v. Forde*, 740 F. Supp. 2d 406, 413 (SDNY 2010) (citing *U.S. v. Moten*, 582 F.2d 654, 662 (CA2 1978)).

The rule announced in *McDonnell* is "not merely an evolutionary development or incremental change" in the law, but "a requirement that is non-obvious" from the "face" of the relevant "statute[s]." *U.S. v. Hoey*, No. S3 11 CR 337 (PKC), 2014 WL 2998523, at *3 (SDNY July 2, 2014). "[T]here was no controlling precedent in this Circuit" anticipating *McDonnell*'s heightened definition of official act, and what precedent existed went the other way, construing the term expansively. *Id.* Indeed, the Justice Dept. had "argued against the adoption of the standard that the Supreme Court adopted" in *McDonnell*. *Id.* And as demonstrated in Points I and II, the indictment's official act and stream of benefits allegations raise considerable doubt whether the grand jury was instructed consistent with the watershed *McDonnell* decision, which had just been handed down.

Given this particularized showing – and absent outright dismissal as urged in Points I and II – the Court should inspect *in camera* for

*McDonnell* compliance any grand jury instructions provided, dismissing the indictment on that alternative ground in its absence. *Id.* at *3 (ordering *in camera* review of grand jury instructions to ensure compliance with "non-obvious" causation standard newly established by Supreme Court in *Burrage v. U.S.*, 134 S. Ct. 881 (2014)).

## POINT V

### THE GOVERNMENT SHOULD FURNISH LIMITED PARTICULARS NECESSARY FOR DEFENSE PREPARATION

This Court should direct the government, per Fed. R. Crim. P. 7(f), to provide a limited bill of particulars identifying 1) all bribes and gratuities – essentially the quids – that Harrington allegedly received; 2) all official acts – the quos – that he allegedly took or agreed to take; and 3) all known coconspirators (besides Grant, Reichberg and CW-1).[11]

Without the requested information, Harrington cannot discern the "specific acts" of which he stands accused. *U.S. v. Walsh*, 194 F.3d 37, 47 (CA2 1999) (particulars required where charges "so general that they do

---

[11] Defense counsel sent the government a detailed request for particulars in July 2016. Ex. A. The government has declined to comply. The parties met and conferred, among other occasions, in Nov. 2016, but were unable to resolve their disagreement. Ex. B.

not advise the defendant of the specific acts of which he is accused")
(internal citation and quotation omitted).

## A.   <u>LEGAL STANDARD</u>

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a
defendant to seek a bill of particulars in order to identify with sufficient
particularity the nature of the charge pending against him, thereby
enabling defendant to prepare for trial, to prevent surprise, and to
interpose a plea of double jeopardy should he be prosecuted a second time
for the same offense." *U.S. v. Bortnovsky*, 820 F.2d 572, 574 (CA2 1987).

A defendant is "entitled to a bill of particulars when the indictment
does not indicate which of his acts are allegedly criminal." *U.S. v.
Ferguson*, 478 F. Supp. 2d 220, 225 (D. Conn. 2007).

"The decision … whether … to grant a bill of particulars rests
within the [court's] sound discretion." *Bortnovsky*, 820 F.2d at 574. In
exercising that discretion, the court must evaluate "the complexity of the
offense, the clarity of the indictment," *U.S. v. Chalmers*, 410 F. Supp. 2d
278, 283 (SDNY 2006), and "the state of discovery." *U.S. v. Falkowitz*, 214
F. Supp. 2d 365, 322 (SDNY 2002).

37

"The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to [merely] helpful, in preparing a defense." *U.S. v. Giffen*, 379 F. Supp. 2d 337, 346 (SDNY 2004).

"Information that is necessary to give the defendant enough specificity about his allegedly criminal conduct must be disclosed … even if it reveals the government's evidence or theories of the case." *Ferguson*, 478 F. Supp. 2d at 225-26 (citing *U.S. v. Barnes*, 158 F.3d 665 (CA2 1998)).

## B.   <u>**ARGUMENT**</u>

Harrington cannot adequately prepare for trial without a bill of particulars describing, with "sufficient particularity," all bribes and gratuities, official acts and unnamed coconspirators in play. *Bortnovsky*, 820 F.2d at 574. "[T]he charges of the indictment are so general that they do not advise [Harrington] of the *specific acts*" of which he stands accused. *Walsh*, 194 F.3d at 47 (emphasis supplied) (internal citation and quotation omitted).

To reiterate, Harrington is charged with participating in a three-year public corruption scheme in which he allegedly abused his position

as a high-ranking NYPD officer, soliciting and accepting personal and financial benefits in exchange and as a reward for "official action." By its terms, however, the indictment does not purport to enumerate either *all* the illicit benefits that Harrington allegedly received or *all* the official acts that he corruptly performed. *See* Indictment ¶10 ("Financial benefits offered and paid [to Harrington] … included, but were not limited to …."); *id.* ¶ 11("Examples of [Harrington's] official acts included, but were not limited to ….").

This failure – the indictment's failure to limit the potential universe of criminal acts that Harrington may be required to defend against at trial via use of the phrase "included, but not limited to" – compels specification of all bribes, gratuities and official acts the government aims to prove. *See U.S. v. Davidoff*, 845 F.2d 1151 (CA2 1988).

By way of analogy, *Davidoff* reversed a defendant's conviction for participating in a racketeering conspiracy where: (1) the indictment alleged that "it was part of the RICO conspiracy to commit extortion offenses … 'includ[ing], but … not limited to'" those "set forth in the … remaining counts"; (2) the defendant unsuccessfully requested a bill of particulars identifying  all "unspecified" acts "indicated … by the phrase

"not limited to"; and (3) the trial court nevertheless admitted evidence of those unspecified acts to prove the defendant's guilt. *Id.* at 1153-55.

Due to the breadth of the statute charged in *Davidoff* – one conferring "wide latitude" to frame an indictment targeting myriad acts – the government was "oblig[ed]" to identify to some "degree" all acts ultimately presented so as to afford the accused "a fair opportunity" to defend himself. *Id.* at 1154 (trial judge "exceeded his discretion … by denying a bill of particulars identifying at least the victims of the discrete extortionate schemes that the prosecution intended to prove …. It is simply unrealistic to think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies ….").

Here, too, the government has detrimentally failed its obligation to particularize the criminal conduct charged. As in *Davidoff*, the universe of potential acts in this case is vast. As a high-ranking police officer, after all, Harrington performed thousands of acts during the relevant three-year period that were arguably "official" under *McDonnell*. Yet the indictment does not assert that *all* – or most – of those official acts were *criminal*.

As a result, defense counsel must search for needles in haystacks, sifting mounds of discovery in hopes of divining what official acts and which personal and financial benefits the government may deem criminal and attempt to prove at trial. *Cf. U.S. v. Tuzman*, No. 15-cr-536(PGG), 2017 WL 4785459, at *13 (SDNY Oct. 19, 2017) (particulars often needed when defendants must scour thousands of transactions – most legitimate – to discover which few the government may seek to prove fraudulent); *accord U.S. v. Savin*, No. 00-cr-45(RWS), 2001 WL 243533, at *2-*4 (SDNY Mar. 7, 2001). "[T]he large volume of materials disclosed" is thus "precisely what necessitates a bill of particulars." *U.S. v. Bin Laden*, 92 F. Supp. 2d 225, 234 (SDNY 2000).

The lack of particulars with respect to the charged conduct – *i.e.*, "the [alleged] wrongdoing itself"[12] – also impairs defense counsel's ability to conduct a "meaningfully directed" private investigation of the facts. *See id.* at 235-239 (particulars warranted "with respect to … allegations … described in [such] general terms that [they] refer to [a] broad class of activity … [and] would require an exceedingly extensive investigation by defense counsel").

---

[12] *Savin*, 2001 WL 243533, at *4.

41

Finally, the government should identify all known coconspirators other than Grant, Reichberg and CW-1 because: 1) the indictment references an unspecified number of unnamed coconspirators; 2) revealing their names will not threaten their safety; and 3) trial will be near by the time this motion is decided. *See Falkowitz*, 214 F. Supp. 2d at 391-92 (identifying coconspirators appropriate in those circumstances unless shown to "significantly prejudic[e] … orderly presentation" of government's case).

## POINT    VI

### THE       GOVERNMENT       SHOULD IMMEDIATELY      IDENTIFY      THE DOCUMENTS  AND  TAPES  IT  SEEKS  TO INTRODUCE AS EVIDENCE AT TRIAL

Harrington respectfully requests that this Court direct the government to identify immediately the documents and tapes it seeks to introduce as evidence at trial.

True, no statute or rule mandates that type of disclosure. Still, it's within a district court's authority – based on "the policy concerns of Rule 16 and principles of fairness" – "to direct the [g]overnment to identify the documents it intends to rely on in its case in chief" when "likely" to promote "a fair trial" and "effectuate … the speedy and orderly

42

administration of justice." *U.S. v. Vilar*, 530 F. Supp. 2d 616, 639-40 (SDNY 2008) (Sullivan, J.) (collecting cases); *see U.S. v. Upton*, 856 F. Supp. 727, 748 (EDNY 1994) (Glasser, J.) (identifying documents government will rely on at trial fosters adequate defense preparation).

Immediate production of a government exhibit list will undoubtedly vindicate these "significant interests," as the discovery in this case is voluminous. *Vilar*, 530 F. Supp. 2d at 639-40 (directing early disclosure "based on the large number of documents at issue"); *accord U.S. v. Chalmers*, 474 F. Supp. 2d 555, 573 (SDNY 2007) (Chin, J.) (pretrial disclosure request reasonable "given the large volume of documents produced"); *Upton*, 856 F. Supp. at 748, 754 (ordering government to identify which of "thousands of documents" produced it would rely on at trial).

The government has so far provided Harrington with more than two-and-a-half terabytes of discovery material,[13] including data files

---

[13] To put that number in perspective, one terabyte of electronically stored data translates to over *75 million* printed pages. *See* Data Volume Estimates and Conversions, SDS DISCOVERY, http://sdsdiscovery.com/resources/data-conversions/sds (last visited Nov. 8, 2017); *see also* Robert L. Kelly, *The Tech Side of E-Discovery: Understanding Electronically Stored Information*, Business Law Today, Vol. 17, No. 1 (Sept./Oct. 2007), *available at* http://apps.americanbar.org/buslaw/blt/2007-09-10/kelly.shtml ("[a]s printed text, a terabyte would occupy 100 million reams of paper (made from 50,000 trees)").

relating to tens of thousands of wire intercepts (among them text messages and calls); nearly half a million emails; more than a dozen computers or hard drives; extractions for dozens of cell phones, tablet devices and SIM cards; as well as numerous other voluminous electronic media such as thumb drives, CDs and a photo card.

Given the magnitude of discovery here – and "the likelihood that the [g]overnment will rely to a significant extent on only a portion" – it is vital for defense counsel to know which documents and tapes the government wishes to introduce at trial. *Vilar*, 530 F. Supp. 2d at 640.

Early disclosure of a "detailed" exhibit list will not only promote a fair trial, but facilitate "efficient [case] administration." *Id.* For example, it will allow "the Court to consider on a timely basis anticipated challenges to the accuracy of … proposed [tape] transcripts to be read by the jury, to conduct a hearing on audibility issues, if necessary, and to entertain rule of completeness requests." *U.S. v. Lino*, No. 00 CR 632 (WHP), 2001 WL 8356, at *29 (SDNY Jan. 2, 2001) (citing Fed R. Evid. 104(a)); *see U.S. v. Chiarizio*, 525 F.2d 289, 293 (CA2 1975); *U.S. v. Carson*, 464 F.2d 424, 436-37 (CA2 1972)). And it's "likely to aid in the

orderly presentation of [the parties'] respective cases at trial." *Id.*; *see Giffen*, 379 F. Supp. 2d at 344.

For all these reasons, identifying immediately the documents and tapes the government seeks to introduce is both "reasonable" and necessary, advancing "fair and efficient [case] administration." *Vilar*, 530 F. Supp. at 639-40. An appropriate order should issue.

## POINT   VII

### THE SIXTH AMENDMENT – IF NOT THE FIFTH – ENTITLES DEFENDANTS TO EARLY *BRADY/GIGLIO* DISCLOSURE

The disclosure obligations imposed by *Brady v. Md.*, 373 U.S. 83 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972), and subsequent cases stem from the Fifth Amendment's due process guarantee. And in our circuit, the government need only turn over constitutionally required exculpatory and impeachment information in time for defendants to use it effectively at trial – not immediately on demand or any sooner. *In re Coppa*, 267 F.3d 132 (CA2 2001); *cf. U.S. v. Ruiz*, 536 U.S. 622, 632-33 (2002) (due process "does not require the [g]overnment to disclose material impeachment evidence prior to entering a plea agreement").

In the years since *Coppa* and *Ruiz*, however, the Supreme Court has held that the Sixth Amendment right to effective assistance of counsel extends to plea bargaining, *Lafler v. Cooper*, 566 U.S. 156 (2012); *Mo. v. Frye*, 566 U.S. 134 (2012) – the culmination of "90% or more of federal criminal cases." *Ruiz*, 536 U.S. at 632; *see Frye*, 536 U.S. at 144 (plea bargaining "is not some adjunct to the criminal justice system; it *is* the criminal justice system") (citations and internal quotes omitted).

It is self-evident that counsel cannot mount an effective trial defense without timely *Brady*/*Giglio* disclosure. By the same token, how can *any* defense lawyer plea bargain effectively, in the sense *Lafler* and *Frye* contemplate, without knowing the relative strengths and weaknesses of the prosecution's case that *Brady*/*Giglio* disclosure helps bring to light? The question answers itself. And when it comes to "the negotiation of a plea" – "almost always the critical point for a defendant" – *Brady*/*Giglio* disclosure is useless unless made well before trial. *Id.* at 1407.

Immediate production of all exculpatory and impeachment information in the government's possession, custody or control is therefore imperative – and independently mandated by the *Sixth*

Amendment's Assistance of Counsel Clause – to preserve the eventuality of effective plea bargaining. The Court should order it accordingly.

## POINT VIII

### ALMOST CERTAIN SPILLOVER PREJUDICE ENTITLES HARRINGTON TO A SEPARATE TRIAL

Harrington moves to sever his trial from that of codefendants Reichberg and Grant. *See* Fed. R. Crim. P. 14(a). If any scenario rebuts the presumption favoring joint trials for jointly indicted defendants, then this one – with Harrington accused of humdrum official acts and his codefendants allegedly tied to hookers and guns – surely fits the bill. A joint trial in these circumstances would create an overwhelming risk of prejudice that will "in effect deny [Harrington] a fair trial." *Chalmers*, 474 F. Supp. 2d at 571 (internal citation and quotation omitted); s*ee Zafiro v. U.S.*, 506 U.S. 534, 539 (1993) (severance warranted where "there is a serious risk that joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence").

47

## A.  ALLEGATIONS OF HOOKERS AND GUNS

Among the varied "personal and financial benefits" allegedly bestowed in this case, one jumps out as illegal per se: the services of a prostitute. Indictment ¶ 8.

According to the indictment and complaint, CW-1 and Reichberg took Grant and a police officer friend on "all expenses paid trip" to Las Vegas for the 2013 Super Bowl, flying there and back on a private jet. *Id.*; *see also* Complaint ¶ 10(a)-(f). More sensationally, CW-1 and Reichberg allegedly "arranged for a prostitute" to come along, *id.* – a violation of the Mann Act, banning interstate transportation to promote prostitution, if true. *See* 18 U.S.C. §§ 2241-42. While in Vegas, the prostitute supposedly stayed in Grant's room, "servic[ing]" him and the others. *Id.*

In return, among other official actions, Grant allegedly assisted CW-1 and Reichberg in "applying for gun licenses." Indictment ¶ 9; *see also* Complaint ¶ 10(u)-(x). Specifically, Grant is accused of pressuring a licensing officer, through a superior, to "expedite the approval of Reichberg's … application for a full carry license, *i.e.*, a license to carry a concealed firearm anywhere in the state of New York." *Id.* ¶ 10(v). Although "the approval process for a full carry license typically takes at

least six months and in many instances, in excess of a year," Reichberg purportedly told the officer reviewing his application that he wanted "his license within a day." *Id.* When the reviewing officer said that was impossible, Reichberg assertedly met with the Licensing Division's Commanding Officer. *Id.* Following that meeting, the reviewing officer was allegedly told "to close out and approve Jimmy Grant's guy." *Id.* (internal quotations omitted).

In addition, Grant is accused of "coaching" Reichberg on what to "put in a letter regarding CW-1's nonexistent work transporting diamonds, and t[elling] Reichberg that his connections at the Licensing Division would approve CW-1's application once the letter was received" – it was a done deal. *Id.* ¶10(x).

## B.  <u>ARGUMENT</u>

Rule 14(a) permits a district court to sever defendants properly joined under Rule 8(b) if it appears that a joint trial will prejudice one of them severely, effectively "deny[ing] him a fair trial." *Chalmers*, 474 F. Supp. 2d at 571 (internal citations and quotations omitted). What could be more prejudicial in this socio-political climate than allegations of a crooked cop involved with hookers and guns?

49

Police officers are tasked to protect the public and "enforce the laws impartially, by fighting crime … through … the relentless pursuit of criminals." NYPD Mission, http://www1.nyc.gov/site/nypd/about/about-nypd/mission.page (last visited Nov. 8, 2017). They aren't supposed to break the law themselves. And they certainly aren't supposed to *endanger* the public by putting guns in the hands of individuals who aren't meant to have them. The conduct of which Grant stands accused, if proved, would be widely perceived as a huge betrayal of public trust – one that ostensibly endangered potential jurors and millions of other New Yorkers.

Allegations of corrupting the gun licensing process are especially explosive given the recent spate of mass shootings and avalanche of press coverage attributing them – rightly or wrongly – to too many guns in too many hands. *See*, *e.g.*, Max Fisher and Josh Keller, *What Explains U.S. Mass Shootings? International Comparisons Suggest an Answer*, NY Times (Nov. 7, 2017), https://nyti.ms/2hODjP5 ("More gun ownership corresponds with more gun murders across virtually every axis …. This suggests that the guns themselves cause the violence."); Derek Thompson*, Mass Shootings in America Are Spreading Like a Disease*,

THE           ATLANTIC           (Nov.           6,           2017),
https://www.theatlantic.com/health/archive/2017/11/americas-mass-
shooting-epidemic-contagious/545078/ ("There are more gun deaths in
America because, simply, there are more guns.").

Equally incendiary – amid the growing public frenzy over men in
power sexually abusing vulnerable women – is the allegation of a
prostitute being flown to Vegas on a private jet to "service" four powerful
men over the course of a boys' weekend. *See*, *e.g.*, Gillian B. White*,
America's Sexual-Assault Epidemic*, THE ATLANTIC (Oct. 21, 2017),
https://www.theatlantic.com/business/archive/2017/10/weinstein-sexual-
assault/543582/ ("high-profile allegations" of sexual misconduct and a
"focus on abusive behavior from powerful men" has led to a "call" for
"swift, and public, accountability"); Dan Corey, *Since Weinstein, Here's a
List of Men Accused of Sexual Misconduct*, NBC NEWS (Nov. 11, 2017),
https://www.nbcnews.com/storyline/harvey-weinstein-
scandal/weinstein-here-s-growing-list-men-accused-sexual-misconduct-
n8165466 (documenting the "Weinstein ripple effect").

That two of those men are claimed to be cops only makes things
worse for Harrington, what with the NYPD's longstanding reputation –

deserved or not – for perpetrating and perpetuating acts of violence against prostitutes. *See* Juhu Thukral and Melissa Ditmore, *Revolving Door: An Analysis of Street-Based Prostitution in New York City*, URBAN JUSTICE CENTER (2003) at 36-37, *available at* http://sexworkersproject.org/downloads/RevolvingDoor.pdf (nearly 30 percent of sex workers surveyed "reported experiencing violence at the hands of police"; 15 percent reported sexual harassment and abuse, including rape and soliciting sexual favors to forgo arrest); *id.* at 47 ("crimes against prostitutes usually go unpunished" due to widespread "police practice of disregarding that violence," placing "blame on the victim … and encourag[ing] further violence against sex workers because it is widely understood that perpetrators of violence against prostitutes can frequently act with impunity").

By contrast, Harrington is neither accused of accepting benefits that are inherently illegal (the quids) nor performing official acts that are inherently improper (the quos). Rather, his criminal exposure hinges on a finding of a corrupt purpose – the pro – connecting the alleged quids and quos.

It follows, then, that the stark "disparit[y]" in the "type of proof offered against" Reichberg and Grant as compared to Harrington weighs decisively in favor of severance. *Upton*, 856 F. Supp. at 736 ("disparities" in the "type of proof offered against each defendant" is a significant factor in "determining whether sufficient prejudice exists to justify severance"); *see U.S. v. Gallo*, 668 F. Supp. 736, 751 (EDNY 1987) ("court must consider the gross disparity in the … venality of the evidence against the joint defendants") (internal citation and quotations omitted); *cf., e.g., U.S. v. Quinones*, 511 F.3d 289, 310 (CA2 2007) (other crimes evidence not unfairly prejudicial when "no more inflammatory" than offenses charged).

This is especially so since the jury may find it difficult to distinguish between Grant's and Harrington's respective roles in the alleged conspiracies. *See U.S. v. Gilbert*, 504 F. Supp. 565, 571 (SDNY 1980) (granting severance where jury may find it difficult to distinguish conduct of one truly bad apple investor – the architect of a stock manipulation scheme – from that of other investors charged with participating in securities conspiracy). Because both men are high-ranking NYPD officers accused of performing official acts on CW-1's and

Reichberg's behalf, the jury could well have trouble individuating them. *Cf. U.S. v. Papadakis*, 510 F.2d 287, 300-01 (CA2 1975) (minimal risk of spillover prejudice where jury able to disregard evidence of "crooked" cop's behavior in considering guilt of non-police officer defendant who "clearly had no connection with [his] corrupt activities").

## C.   CONCLUSION

Because the risk of spillover prejudice from a joint trial is monumental – and too pervasive for "standard limiting instructions" to cure in the current climate, *U.S. v. McDermott*, 245 F.3d 133, 139-40 (CA2 2001) – Harrington should be severed from his codefendants to avoid a potential "miscarriage of justice." *Gallo*, 668 F. Supp. at 749 (internal citation and quotations omitted).

## POINT IX

**HARRINGTON JOINS IN ALL MOTIONS OF CODEFENDANTS REICHBERG AND GRANT TO THE EXTENT APPLICABLE TO HIM AND NOT INCONSISTENT WITH THE ARGUMENTS SET FORTH HEREIN**

## CONCLUSION

For the reasons stated, this Court should grant Harrington's motions in full.

Dated:      New York, NY
            Nov. 13, 2017

                              Respectfully submitted,

                              THE WEINSTEIN LAW FIRM PLLC

                              By:    /s/ Andrew J. Weinstein
                              Andrew J. Weinstein
                              Barrie A. Dnistrian
                              800 Third Avenue, 18th Floor
                              New York, NY 10022
                              T:  (212) 582-8900
                              F:  (212) 582-8989
                              E: aweinstein@twlf.com
                                  bdnistrian@twlf.com

                              LAW OFFICE OF MARC FERNICH
                              Marc Fernich
                              Giuliana Graham
                              810 Seventh Avenue, Suite 620
                              New York, NY 10019
                              T:  (212) 446-2346
                              F:  (212) 459-2299
                              E:  maf@fernichlaw.com
                                  ggraham@fernichlaw.com

                              *Attorneys for Defendant Michael Harrington*