UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

JEREMY REICHBERG

                        Defendant.

16-cr-468 (GHW)

**DEFENSE SENTENCING MEMORANDUM
ON BEHALF OF JEREMY REICHBERG**

HAFETZ & NECHELES LLP
Susan R. Necheles
Gedalia M. Stern
10 East 40th Street, 48th Floor
New York, N.Y. 10016

March 19, 2019

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION …………………………………………………………… 3

I.   JEREMY REICHBERG'S BACKGROUND…………………………. 4

    A.  Jeremy Reichberg's Lifelong History of Charitable Acts 5

    B.  Mr. Reichberg's Role as an Unofficial Police Liaison 12

II.  THE CHARGED CONDUCT………………………………………… 16

    A.  Related Conduct 24

III. GUIDELINES CALCULATION………………………………………. 28

    A.  Mr. Reichberg was Neither a Leader Nor Organizer of the Criminal Enterprise 29

    B.  The Court Should Use a Valuation Between $6,500 and $15,000 as the Proper §2C1.1(b)(2) Enhancement in this Case 30

        1.  The proper §2C1.1(b)(2) valuation is between $6,500 and $15,000 31

        2.   The Government's valuation of more than $150,000 overstates the harm to the public in this case 33

IV.  THE COURT HAS BROAD SENTENCING DISCRETION ……. 38

V.   BOTH NATIONAL AND LOCAL COURTS ROUTINELY VARY DOWN FROM THE BRIBERY GUIDELINES…………………… 41

CONCLUSION…………………………………………………………… 46

## INTRODUCTION

We respectfully submit this sentencing memorandum on behalf of Jeremy Reichberg, who is scheduled to be sentenced on April 4, 2019.

After a trial, Mr. Reichberg was convicted of violating one count of 18 U.S.C. § 1349, one count of § 1343, one count of § 371, and one count of § 1512. He was acquitted of the count charging him with a violation of § 666.  The first three of these counts relate to a bribery conspiracy the jury found he participated in with numerous NYPD officers. The final count of conviction was for obstruction of justice. In this memorandum, we seek to explain who Mr. Reichberg is and how he came to be involved with the NYPD. We also try to put Mr. Reichberg's conduct in context and explain why a substantially below-guideline sentence is a just and appropriate sentence in this case.

In this memorandum, we will show that Mr. Reichberg has led a life where he seeks to treat other people with respect, a life where he has sought to help others in need.  Mr. Reichberg acknowledges he made mistakes and acted in a manner of which he is not proud. "[A] sentencing judge," however, "must have some understanding of the diverse frailties of humankind." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks omitted). Moreover, in "deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have

a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'" *Id.* (quoting Guido Calabresi, What Makes a Judge Great: To A. Leon Higginbotham, Jr., 142 U. Pa. L. Rev. 513, 513 (1993)). And because there is "no burden more onerous than imposing sentence in criminal cases," judges should have "a kind and understanding heart." *Id.* We respectfully request that the Court bear these recent exhortations from the Second Circuit in mind both while considering Mr. Reichberg's conduct and when deciding on his ultimate punishment.

The PSR calculated the Total Offense Level as 32—for a guideline range of 121-151 months. We dispute this calculation and submit that Mr. Reichberg's Total Offense Level is 22 and his guideline range is thus 41-51 months. But even if the Court accepts the PSR's and U.S. Attorney's guideline calculation, we believe a substantial downward variance is appropriate because the guidelines do not accurately capture the real-world damage to the public trust by Mr. Reichberg's actions. We therefore respectfully submit that a sentence of between 6-12 months' incarceration is "sufficient, but not greater than necessary" to achieve the goals of the federal sentencing regime.

## I.     **JEREMY REICHBERG'S BACKGROUND**

Mr. Reichberg was born in 1974 in Brooklyn to Meyer and Esther Reichberg. He was raised in the Bobov Chassidic sect and attended the Bobov school until age 21, when he married his wife, Rachel, in an arranged marriage. Mr. Reichberg

graduated in 1995 with a degree in Talmudics.[1]  For the first few years after his marriage, Mr. Reichberg continued studying at a religious seminary—as is common in the ultra-Orthodox community. PSR ¶ 81. After 2000, he left the *Yeshiva* and began working to support his family.  At first, he sold health and beauty aids wholesale before eventually becoming a jewelry broker. PSR ¶¶ 87-88. He subsequently began working as an expediter and real estate consultant. *Id.* at 85.

While Mr. Reichberg loved his Chasidic community, he hated its narrowness and isolation. While his father and brothers were extremely observant and content to stay within their tight-knit community, Mr. Reichberg was different. He loves to talk to, and get to know, all kinds of people, from both within and outside of his community, bringing them into his life and becoming part of their lives. And so he figured out a way to do this which was socially acceptable to his community: he became a community volunteer, and then a "police liaison."

## A.    Jeremy Reichberg's Lifelong History of Charitable Acts

Through these volunteer roles, Mr. Reichberg was able to do two things he deeply loves: getting to know lots of interesting people, including people from outside of the Orthodox community, and also helping people struggling with various life crises.

---

[1] Given his degree, and years spent at religious seminaries, *see* PSR ¶¶ 80-81, Mr. Reichberg was sometimes called by the title Rabbi. In the Jewish community, the term "Rabbi" can be used in various ways: sometimes to refer to a person who leads a congregation, a person who is a scholar or studies Jewish materials, or a leader in the community who is learned in Jewish law but does not necessarily lead a congregation or spend his time studying.

As the letters to Your Honor and the statements on the video we have submitted to the Court show, Mr. Reichberg's nature is that of a person who loves to help people when they are struggling with various difficulties. Mr. Reichberg is not an ambitious man who seeks to transform the world. But he has lived his life seeking to make the world better, in small ways, by treating people with respect and helping them in ways that really matter to their lives. Person after person tells the Court how Mr. Reichberg assisted them in various ways.

While many of the things that Mr. Reichberg did were small, they were things that often mattered greatly to the person he was interacting with. For example, Shulem Ilowitz writes about how Mr. Reichberg purchased a gift card for his ten-year-old son to reward him for putting away the prayer books after Sabbath morning prayers. Letter of Shulem Ilowitz, Ex. 43. This was not a major act—but it mattered to one little boy. *Id.*

This pattern of treating people with decency and respect was not reserved for only "important" or powerful people. Two people on the video tell Your Honor how, even though they were neither rich nor influential, Mr. Reichberg went out of his way to treat them with kindness. David Gutierrez, a maintenance employee of the gym where Mr. Reichberg used to exercise, came to know Mr. Reichberg because he was one of the few people who would consistently speak to Mr. Gutierrez. Mr. Gutierrez spoke English poorly and tells how Mr. Reichberg "used to teach me how to say words, even though I was cleaning the gym." The thoughtfulness and simple decency Mr. Reichberg showed Mr. Guttierez was enormously important to Mr.

Gutierrez, who tells the Court that: "I used to wait for him every day to come, because I know he was going to come around six, seven o'clock to work out, and I was happy he was there because that was the only friend I had." Video at 06:53. Similarly, Robin Anders, the general manager of a restaurant Mr. Reichberg frequented, tells the Court that:

> A lot of people of his stature in society tend to either look down at restaurant staff as 'you're serving me,' but I've never gotten that from Jeremy. Not once, he was always very pleasant, very humble, very respectable, and you would think he's on your level, the way he dealt with you. I admired that with him, year after year, for all the years I've known him. And even today, he is still that pleasant person that I got to know him many years ago. Actually, it's to the point I consider Jeremy a very good friend of mine.

Video at 11:15.

But Mr. Reichberg went beyond treating everyone with decency and respect. Numerous letter writers tell the Court how, when they faced personal problems, Mr. Reichberg jumped in to help.

For example, on the video, Joe Mizrahi, a Lebanese immigrant who has known Jeremy for 20 years, talks about telling Mr. Reichberg about the difficult time he was having with his bipolar daughter and how he "couldn't handle it." Video at 03:06. Mr. Reichberg came right over, called a psychiatrist he knew, and managed to convince him to see Mr. Mizrahi's daughter right away. When the psychiatrist referred the daughter to a specialist in Boston, Jeremy went with them to Boston. Mr. Mizrahi's daughter is now happily married with six children.

This was not the only time Mr. Reichberg dropped everything to help Mr. Mizrahi. On another occasion, Mr. Mizrahi was feeling ill and his wife was taking

him to the doctor. Jeremy happened to call and Mr. Mizrahi said that he could not talk because he was not feeling well. Mr. Reichberg immediately came over and, seeing how ill Mr. Mizrahi looked, called an ambulance to take him to the hospital. Mr. Mizrahi ended up having an angiogram. Mr. Mizrahi tells the Court that "without him I don't know, really, what happen." *Id.*

This willingness to drop what he was doing and assist someone in need is the way Mr. Reichberg has lived his entire adult life. Aron Goldman writes about an incident which occurred in 2001, when Jeremy was a young man. Letter of Aron Goldman, Ex. 58. Mr. Goldman was one of four hundred Chassidic men who had traveled to Poland as part of a trip led by Jeremy's grandfather to pray at the graves of Rabbis buried there. In the middle of the night, when the group was about to board a bus to Warsaw, Mr. Goldman started experiencing severe abdominal pains. He called Mr. Reichberg's grandfather, who came to Mr. Goldman's room along with Jeremy. Mr Reichberg insisted on staying back to care for Mr. Goldman.

Feeling somewhat better, Mr. Goldman decided to go to sleep but Jeremy nevertheless insisted on remaining in his room. Mr. Goldman writes:

> About 2 hours later I awoke to excruciating, unbearable, and unrelentless pain. Jeremy immediately summoned an ambulance and I was taken to emergency care at a hospital, with him at my side throughout. He also made sure to be in touch and update my family and my physicians.

> I was diagnosed with a serious case of pancreatitis and their recommendation was for a hospital stay. I was adamant to be treated in my home country and begged to be sent home. The physician agreed and injected me with a powerful dose of painkillers. The Reichbergs extended every effort on my behalf and arranged that I be allowed to leave on my scheduled flight back to England.

Jeremy, in his kindness, did not leave my side until I was securely taken aboard the flight. My experience with Jeremy will forever stay etched in my memory, from him I have witnessed and learned such generosity and kindness. I am forever grateful to the A-mighty G-d for saving me and sending me a special messenger through my ordeal.

*Id.*

Mr. Reichberg's assistance was not limited to members of the Chassidic community. Any acquaintance who had difficulties received Mr. Reichberg's attention. Joey Neuman, a construction worker who was working on a site which Mr. Reichberg was supervising, talks on the video of a time when he was hospitalized with a severe kidney infection. He was worried that he would lose his job. But when he spoke to Mr. Reichberg, all Mr. Reichberg asked about was whether there was anything he could do to help:

> He said … if you need something let me help you, I don't care about the work, don't worry the job is here. … And he's like do you need anything, right away, what about your wife, I have a wife and kid at home, which they depend on me, I'm the sole proprietor of the house, do you need any money, do you want me to go by the house?  Right away that was his first concern, was on my end, and I know him from work, we're not—we don't go to baseball games and things like that, we work together, I know him as a friend, he treats me like a friend, I treat him. That I didn't expect from him. I didn't get that from people that I know for ten, fifteen years, weren't reaching out to me like that.

Video at 07:24.

Mr. Reichberg became known in his community as someone who helped others facing medical emergencies. Jacob Chaim, a brother-in-law, tells the Court how Mr. Reichberg often used his contacts in the medical field to help others:

> On a personal level, I too have been helped by Mr. Reichberg many times. In one instance—it was about 16 years ago—my seven year old son Abraham was waiting for his school bus when he was struck by a bicyclist in the face, causing a large cut near his eye, with blood

gushing from his eyes and face. An ambulance was called and he was rushed to the hospital.

I naturally turned to my dear brother-in-law for help and advice. He immediately dropped everything, came to the hospital, located a specialist who was a great expert and did the surgery very well. Mr. Reichberg stayed at our side until the doctor finished and everything was fine. (Incidentally, many people, both acquaintances and strangers, were helped by his knowledge and contacts in the field of medical assistance.)

Letter of Jacob Chaim, Ex. 24 (parentheses in original).

Others also tell how Mr. Reichberg used his contacts in the medical world to help people in times of emergency. *See, e.g.,* Letter of Mindy Perlman, Ex. 16; Letter of Moses and Brigette Markowitz, Ex. 10; Letter of Tzvi Perlman, Ex. 17; Letter of Faygee Werzberger, Ex. 34.

Mr. Reichberg also assisted his wife in founding and running Satmar Chaya Devorah Lax Junior Bikur Cholim, a division of Satmar Bikur Cholim. This is an important charitable organization which helps people who are hospitalized, providing Kosher meals to patient and their loved ones staying in the hospital, arranging for transportation, to and from hospitals and doctors, and visiting sick people in the hospital. Letter of Linda Kraus, Ex. 45; Letter of Chana Jaffe, Ex. 48.

Many letters also mention how Mr. Reichberg loves to sing—especially on holidays and on Shabbat. Letter of Esther Benattar, Ex. 23.  Mr. Reichberg used his love of music as yet another way of helping others.

One way he did this was singing at people's weddings. As hundreds of people from the community are usually invited, Chassidic weddings are large and expensive affairs. This expense is difficult for many to bear. To help alleviate the

stress from this expense and spread joy at weddings, Mr. Reichberg volunteered to

sing at the weddings of people who could not afford to hire entertainment, and often

drafted other friends to come and sing with him. *See* Letter of Hannah Fried, Ex.

25, ("Jeremy uses his talent/voice to sing at weddings and when he knows [the]

bride and groom don't have money he doesn't charge them."); Letter of Yoel Shtesl,

Ex. 32 ("I have a friend who had lost his dad when he was a young child and was

getting married. I had spoken to Jeremy a couple of weeks before his wedding and

told him how my friend cannot afford to pay for a singer for his wedding. Without a

blink, Jeremy had offered to sing at no cost!  Besides for the excitement of my

friend, I was so touched, yet I was not surprised, as Jeremy would often sing at the

wedding of either poor families or sing at functions with the underprivileged.").

Another way he used his love of music to help others was by visiting people

who were ill and singing to them to raise their spirits. *See e.g.,* Letter of Jacob

Chaim, Ex. 24. A related story is told on the video by Avraham Fried—a famous

singer in the Orthodox Jewish world. Mr. Fried tells how he got a phone call from

Mr. Reichberg on which he begged Mr. Fried to come and sing for a boy who was

very sick:

> I remember getting one phone call a couple of years ago from an
> individual, who from the pain in his voice when he asked me to come
> sing for this young boy, I was sure he's talking about his own son. But
> when I asked him, I said excuse me, Jeremy, is this your son that
> you're calling me about? He said no, no, no, no, no, it happens to be a
> neighbor. Not a neighbor all year round, but a neighbor only for the
> summer time. Up in the country, we share the same bungalow colony.
> And amongst all the phone calls that I have gotten over the years to
> come sing for children, for some reason this, the passion that he had,
> he was so broken. He says a young boy, he was just diagnosed, maybe

five, six years old. The family is tzebrachen [*broken*], the family is
shattered. And if you come sing for them, it'll give them, it'll give them
some hope. It'll give them some joy. I remember it was a Saturday
night, it was raining up in the country, and he was on the phone with
me the whole time telling me exactly how to go. And he was waiting for
me out in the rain, in the parking lot, in the mud and all the puddles of
rain that we walked, and he took me in through a side entrance. And
we surprised the young boy and the family, and uh, like I said, this,
the passion, the pain that he had inviting me to come sing for this boy,
like I said, I was sure this was his child. So this is the Jeremy that I
met, this is the Jeremy that I know. A man full of heart, a man full of
soul, only looking to help others.

Video at 08:50.

## B.    Mr. Reichberg's Role as an Unofficial Police Liaison

Another way Mr. Reichberg attempted to help people, especially those in his

community, was by building relationships with members of the NYPD. He saw that

other members of his community were (unofficial) "police liaisons"—a relationship

that was encouraged by the Police Department. Mr. Reichberg decided to likewise

become involved in assisting people in police matters.

These relationships with police officers not only allowed Mr. Reichberg to

help members of his cloistered community, they gave him a whole new group of

friends. These new friends were different—and more open—than his friends from

within his community. There can be no doubt that these were genuine friendships—

as even the Government acknowledged. *See, e.g.,* Tr. 6722; 6789. Mr. Reichberg

loved the breath of fresh air and freedom that came from knowing and interacting

with people from outside of his community. Photographs and the evidence at trial

show the long history of these friendships, with police officers attending his family's

life cycle celebrations, such as his son's Bar Mitzvah and daughter's wedding, Ex. A;

coming to his home for meals and celebrations, Ex. B; and Mr. Reichberg attending

their promotions. Ex. C. As shown at trial, Mr. Reichberg also spent countless hours

on the phone talking with these police friends.

Beyond being friends with these officers, Mr. Reichberg threw himself into

the role of police liaison. Not many letters tell the Court about Mr. Reichberg's work

helping people in the community with police matters because this case has

frightened many people and they are, therefore, understandably scared to discuss

how he helped them with these matters. There is, however, substantial evidence

from newspaper articles, some letters, and trial testimony of how Mr. Reichberg

legitimately assisted members of the community with police matters.

First, there was the testimony of Inspector Beaudette. He testified that he

got to know Mr. Reichberg through meetings regarding upcoming Jewish holidays

at 1 Police Plaza. Tr. 5126-27. Beaudette also testified that Mr. Reichberg was a

useful person to deal with and that Mr. Reichberg was an "unofficial police liaison,"

a term which Beaudette took credit for coining. Tr. 5089-90; 5128. "The vast

majority of interactions" Beaudette had with Mr. Reichberg were "on behalf of

someone else who needed help, not himself generally." Tr. 5114. Beaudette further

testified that Mr. Reichberg was helpful in his role as a police liaison and recounted

a specific incident where Mr. Reichberg's involvement helped prevent further

violence. Tr. 5148. Beaudette also recalled Mr. Reichberg reaching out to him when

there was an emergency situation which required police assistance at a synagogue

on Fifth Avenue. Tr. 5130-31. It is thus not surprising that Mr. Reichberg received a certificate from the NYPD Civilian Police Academy. *See* Ex. D.

Similarly, letters to the Court show that Mr. Reichberg was intimately involved as a community liaison regarding security issues at synagogues and schools. This was a particularly sensitive issue as the Chassidic community is subjected to a disproportionately high rate of hate crimes. *See, e.g.,* https://www.nytimes.com/2019/02/18/nyregion/anti-semitism-brooklyn-new-york.html (discussing the recent "wave of anti-Semitic attacks in Brooklyn"); www.nypost.com/2015/06/28/hate-crimes-against-jews-muslims-surge/ (of the 127 confirmed hate crimes during the first six months of 2015, 56 were anti-Semitic crimes). Thus, after terrorist attacks or other high profile hate-crime incidents, many institutions in the Orthodox community seeks extra police protection. Mr. Reichberg attended police briefings for community leaders around the Jewish holidays and in response to terrorist events. Ex. E. And as a community liaison, Mr. Reichberg helped arrange this additional police protection. *See,* Letter from Rabbi Joshua Metzger, Ex. 35 ("In particular, after the tragic terrorist attacks against Jews in Paris, people were scared to come to the Synagogue… Every day, the selfless men and women of the police and armed forces stand at the ready to protect the public safety. Jeremy helped spearhead this noble effort on a communal level for many years."); Letter from Rabbi Aron Ginsberg, Ex. 39 ("[W]hen parents in our community were frightened by the risk of terror attacks, Mr. Reichberg devoted many hours in attending meetings to discuss the issue. He then reached out to

authorities on our behalf to secure heightened levels of security for the school."); Letter from Rabbi Tzvi Reinhold, Ex. 38 ("On any important occasion where the *Shul* [Yiddish for Synagogue] would need police protection, for example, during holidays and particularly worrisome times after terrorist attacks against Jewish people, Jeremy would arrange for police security.").

Mr. Reichberg also helped obtain police permits for religious, charitable, and community affairs. One example is Camp Simcha, a camp for children and teenagers with cancer and other hematologic illnesses. In 2013, Camp Simcha was planning to have an outing at Times Square, where the children were to perform on the raised stairs and have their pictures appear on the giant electronic billboards. As Shaindy Lowenthal, the Program Director for Camp Simcha, wrote at the time, Mr. Reichberg was instrumental in helping to arrange the police permits and entertainment for this event:

> Jeremy-
>
> Words alone cannot express the *hakaras hatov* [Hebrew for appreciation] we have to you for all the time, energy and significant effort you put in to make last Thursday's New York trip for the campers of Camp Simcha the tremendous success that it was. Thank you for all the arrangements you made with the different departments of the NYPD and ESU that were necessary to pull together the exciting demonstrations at Floyd Bennett Field that kept our campers entertained throughout the afternoon. Thank you for arranging the police escort that accompanied us into Manhattan, and finally, thank you for helping us get the permission (permits, clearance, protection, parking) to create the climax of our day, the song and dance on the steps of Time Square in the evening. As you can see on our Hall of Fame music video, the campers felt so empowered and energized being at Times Square, the "crossroads of the world", sharing their message

of hope and inspiration, that all children (and adults) battling diseases are champions.

Shaindy Lowenthal Email, Ex. F.

Additionally, Mr. Reichberg was also a Chaplain with both the Westchester County and Floral Park Police Departments and assisted those Departments when required. For example, in 2016, a Jewish woman was found murdered in her home. Mr. Reichberg and an organization called Misaskim went to the scene to ensure that the body was treated in accordance with Jewish law. Ex. G. On another occasion, when a police officer in Westchester County died, Jeremy Reichberg was asked to attend the funeral as a representative of the Westchester Police Department.

## II.   **THE CHARGED CONDUCT**

We do not argue here that the evidence at trial was insufficient to show that Mr. Reichberg conspired to or participated in giving bribes to members of the NYPD. We accept, as we must, the jury's verdict and the Court's ruling denying Mr. Reichberg's Rule 29 motions.

However, the PSR does not accurately summarize the evidence from trial—and we explain some of those inaccuracies below. Moreover, with respect to some of the trial testimony which we did not challenge because it was not relevant to the charges in the Indictment or because the evidence which contradicted the testimony was inadmissible hearsay, we point out the false allegations below.

As the trial testimony established, in 2008, Rechnitz arranged to go to a fundraising dinner for the NYPD football team in order to get a parking placard.

16

*See* Tr. 2386-2388. Rechnitz testified that he donated $5,000 and went to this dinner where he met Mr. Reichberg, Stephen McAllister, Jimmy Grant and other officers. Tr. 2389. He was eventually given a plaque with his name on it but received no parking placard. Tr. 2390.

Rechnitz got the impression that Mr. Reichberg was a "big shot; he was very powerful" because Jeremy was friends with Steve McAllister, an NYPD Inspector, and Jimmy Grant, a NYPD Captain. Tr. 2391. Rechnitz decided to develop a relationship with Mr. Reichberg and the police because he "thought it would be good for my image to be a big shot in popularity and attract investors, showing that I have significant connections in the police department." Tr. 2392.

It is important to note that there is no evidence of any bribery of NYPD officers by Mr. Reichberg prior to Rechnitz's donation. Rechnitz claimed, however, and this allegation is reflected in ¶ 27 of the PSR that, after meeting Mr. Reichberg, Rechnitz spoke with him about protests that were occurring in front of his boss's diamond store. According to Rechnitz, Mr. Reichberg set up a meeting with Steve McAllister who said that "he could take care of the problem, but that we would have to donate money to the NYPD money to the NYPD football team. So I raised another $25,000." Tr. 2637. According to Rechnitz, after that "there was more of a police presence, and then eventually the protestors stopped." Tr. 2638; *accord* Tr. 2639. (Rechnitz testifying that the protestors "got quiet right away.")

However, this entire story, including Rechnitz's claims that the protestors were stopped or "quieted down," is flatly contradicted by contemporaneous emails

and newspaper reports. First, emails show that Rechnitz's boss, began complaining about the protests beginning in October 2009. Ex. H, pp. 1-3. We know, however, that the donation from Leviev to the NYPD was received prior to August 24, 2009, since the football team gave Leviev a thank-you plaque on that date. *Id* at 9.

What is more, even after this donation, the protests continued. Photographs in press releases put out by the protesters show that the protests continued to be held right in front of the store and, according to the Executive Director of the Jewelry company, "the same as always. Right in front of the store, and pretty loud." *Id* at 11-12, Email from David Klein, October 20, 2009. The protests continued in the same manner throughout 2010, on Valentine's Day, Mother's Day, and Christmas. *Id* at 26-28, 30-31, 38-39.

Thus, while Rechnitz may have arranged for Leviev's store to give a donation to the NYPD football team, the *quo* that was supposedly promised—preventing the protestors from protesting—never occurred.

This incident is emblematic of Mr. Reichberg and Rechnitz's entire relationship with the police. While the evidence established that Rechnitz lavished gifts on the police, neither Rechnitz nor Mr. Reichberg asked for or received much back in return.

Indeed, it was not just the police upon whom Rechnitz lavished gifts. Rather, Rechnitz gave gifts to Mr. Reichberg and others as well. The evidence established that beginning in 2012, when Rechnitz began to make large profits from loans he made to a ticket brokering company, Rechnitz started to "live large," spending

extravagant amounts of money on his friends, including Mr. Reichberg, and on

police officers. The largest expenditures were for flights, trips, and tickets to

sporting events:

- In February 2012, Rechnitz went to Las Vegas to watch the Super Bowl with Mr. Reichberg and a group of friends. Tr. 3393, 4091;

- In the same month, Rechnitz took a group of friends, including Mr. Reichberg, on a private plane to Las Vegas. There were no police officers present. Tr. 4092;

- In January 2013, Rechnitz took a private plane to the BCS National Championship game in Florida and brought Andrew Capul, Eddie Gardner, and James McCarthy along. Stephen McCallister flew back with the group as well. *See* Tr. 2920-2928;

- In February 2013, Rechnitz took a group of people, including Mr. Reichberg and Jimmy Grant, on a private jet to watch the Super Bowl in Las Vegas. Tr. 3393-3394;

- In March 2013, Philip Banks became the Head of the Department and thereafter Rechnitz began taking Banks, Seabrook, and Harrington out to dinner and a cigar bar regularly. Tr. 2564, 2662, 6494;

- In 2013, Rechnitz provided David Colon, the Chief of Community Affairs, with a hotel room for his daughter's sweet sixteen party. Tr. 2161-2162;

- In July and August, 2013, Rechnitz took Mr. Reichberg and some other people (but no police) to the Dominican Republic. Tr. 3397-3400;

- In November and December, 2013, Rechnitz took Mr. Reichberg, Banks and Seabrook on two trips to the Dominican Republic, once on a private plane and once flying commercial. Tr. 3403-3406;

- In March, 2014, Rechnitz took Mr. Reichberg, Banks, and Seabrook to Israel. Tr. 3412-3414;

- In July 2014, Rechnitz took Banks and Seabrook to LA. Tr. 4093;

- Rechnitz paid for hotel rooms for Harrington, Grant, and Mayor DeBlasio's campaign director. *See* Tr. 2427, 2552, 2592;

- Rechnitz gave tickets to sporting events to Banks, Harrington, and Reichberg. Tr. 2889, 2901.

While this evidence shows that Rechnitz's motive for providing lavish benefits to third parties—both public and private—was not just to receive official acts in return, it is still unquestionably true that this was an enormous, and unseemly, amount of money to be lavishing on public officials. Nonetheless, Mr. Reichberg admits that he fell in love with the lavishness of this lifestyle and was blinded by his love for "the good life." Unlike Rechnitz, he did not have this kind of money, had never flown on private planes, did not buy Rolexes for himself, and did not jet off to the Dominican Republic or Las Vegas for two-day jaunts. Simply put, Mr. Reichberg loved getting these gifts from Rechnitz and loved being in an atmosphere of such wealth and privilege. He readily admits that he should have known better than to put either himself or his friends, high ranking police officers, in a position where such expensive gifts were being given to public officials. Among his many regrets is that he got his friends involved in a situation where their integrity was called into question. He recognizes that this created, at the very least, both an appearance of impropriety and an unseemly situation where doubts about the police officers' integrity were inevitable. He regrets that by doing so he caused his friends careers to be destroyed and their lives, and his own, to be uprooted.

But while the *quid*s in this case were enormous, the *quo*s were not. The items which the Government argues in the PSR that Mr. Reichberg or Rechnitz received are relatively minimal. (They are also substantially more numerous than the limited group of official acts the Government argued in summation. Tr. 6618.) We

address each of these *quo*s, officer by officer, below. Before doing so, however, we want to be pellucidly clear that we are not dismissing the deleterious effect on the public trust of even minor acts of official corruption. Rather we are only arguing that in determining Mr. Reichberg's culpability, the Court should recognize that this is not a case where the public was defrauded of substantial benefits or hugely valuable public resources.

We discuss below each of the *quo*s the PSR claims were provided to either Mr. Reichberg or Rechnitz:

- Philip Banks: PSR ¶23:
  - The PSR claims that Banks provided Rechnitz with a parking placard. Rechnitz did not use the parking placard and believed it was not usable because he needed an identification card which he did not receive from Banks. Tr. 3924-3925.
  - The PSR also claims that Banks promoted Jimmy Grant. The evidence at trial, however, overwhelmingly showed that Grant was qualified and was long overdue for this promotion. *See, e.g.,* Tr. 5387, 5401, 5451, 5454.

- Michael Harrington: PSR ¶24:
  - The PSR claims Harrington dispatched NYPD boats and helicopters for private events. In fact, the police boat took out police officials and members of the Jewish and Muslim communities at a police community event which was jointly put together by Mr. Reichberg and the NYPD Community Affairs Bureau. *See* Tr. 4370, 6025-6026, 6260-6261. The helicopter was already in the area when it did a thirty-second flyover. Tr. 6289.
  - Harrington also provided a police car to give an associate of Rechnitz a short ride to Madison Square Garden so she would not be late for a game. Tr. 2663-2665.

- James Grant: PSR ¶25:
  - The PSR states that Grant "assisted" Reichberg and Rechnitz in obtaining NYPD gun licenses. We note that, there was never any allegation that Reichberg paid any bribe for his gun license; Grant simply assisted him with the process as a friend. As to Rechnitz, he

never submitted the paperwork and never obtained the license.  Tr. 1999, 2080, 3931-3934.
- o The PSR also claims that Grant twice contacted officers to have them give DATs to two arrestees. In neither of these cases were the arrestees given DATs, even though a DAT would have been appropriate.  Tr. 198-201, 249-250, 4929, 4951-4961.
- o The PSR quotes Rechnitz's claim that Grant gave him rides in his police car. There was, however, no corroborating evidence of this claim.
- o Finally, Grant was acquitted, apparently because the jury disbelieved these allegations.

- David Colon: David Colon is not alleged in the PSR to have done any police favors for Reichberg or Rechnitz.

- Stephen McAllister: ¶ 27:
  - o The PSR states that McAllister provided police action to address the protests in front of Rechnitz's boss's business.  But as discussed above, that claim is false.
  - o The PSR speculates that McAllister helped to get Lev Leviev escorted through the Lincoln Tunnel in 2008.  See *id*. ("likely McAllister."). There is no evidence to support this speculation.

- Michael Milici ¶ 28:  Milici is not alleged in the PSR to have done any favors for Rechnitz or Mr. Reichberg.

- Michael Andreano ¶ 29:
  - o The PSR states Andreano gave Mr. Reichberg's nurse a ride to a nail salon in a police vehicle and assisted Mr. Reichberg with an unidentified private dispute.

- Andrew Capul, Eddie Gardner, James McCarthy and Eric Rodriguez ¶¶ 30, 31:  None of them is alleged in the PSR to have done any police favors for Rechnitz or Reichberg.

Thus, contrary to the PSR's claim, ¶ 18, that Jeremy engaged in this bribery scheme in order to "monetize" his relations with these police officers, the evidence at trial establishes fairly minor *quo*s provided by the police to Mr. Reichberg. Only the phone calls regarding the possibility of giving DATs have anything to do with Mr.

Reichberg's expediting business. Clearly this was not a scheme to "monetize" Mr. Reichberg's police contacts as the Government contends.

Indeed, the PSR also wrongly claims that Mr. Reichberg "monetized" his relationship with other public officials. These claims too have no support in the evidence.

First, the PSR claims, ¶ 21, that Mr. Reichberg used police connections to "fix" tickets, which Rechnitz testified meant getting tickets dismissed and avoiding any points or fines. *See*, Tr. 2417, 2670. The evidence was clear, however, that Rechnitz's testimony that Mr. Reichberg "fixed" tickets was false. Mr. Reichberg charged people to handle their tickets and then hired lawyers for their cases. But every ticket which Mr. Rechnitz testified was "fixed" was proven *not* to be fixed. Instead they all resulted in convictions, with points and sometimes fines. *See e.g.,* Tr. 4108-4152, 6089-6100.

The Government also argued at trial that Mr. Reichberg charged people to get them out of jail quickly and that he would call up his either Grant or McAllister and have them call the precinct in question to see if Mr. Reichberg's client could get a DAT. We showed at trial, however, that in both cases, these individuals should have obtained a DAT, according to the regulations in Police Department Manual. *See,* Tr. 249-250, 4951-4961. In addition, in neither case was the arresting officer ordered to give a DAT. Tr. 245, 4948. Finally, in each of these cases the evidence showed that Mr. Reichberg spent substantial time calling Central Booking, the District Attorney's Office, the Court Clerk's office, and others, just trying to push

the system along. *See, e.g.,* GX W-1175, W-1177, W-1192, 817. He also arranged for a private attorney to come and bail the individual out of jail. Thus, while Mr. Reichberg may have attempted to use his contacts, he also did what every lawyer or paralegal acting on behalf of a criminal defendant does when she has a client who has been arrested on a state case. They call the police station, Central Booking, the arrest officer, and the Court Clerk, doing everything they can to push the system along so the defendant gets to court as quickly as possible. There is simply no evidence of anything nefarious in what Mr. Reichberg did with regard to these arrests.

Given the paucity of facts showing any profit made by Mr. Reichberg, we submit it makes little sense to conclude that Mr. Reichberg sought to bribe the police in order to "monetize" that relationship.

## A. Related Conduct

Finally, the PSR claims that Mr. Reichberg engaged in three other bribery schemes. *See* PSR ¶ 34. None of these claims stand up to scrutiny.

First, the PSR alleges that Mr. Reichberg used a "contact," the head of the state court officer's union, to get people excused from jury duty, and that he charged for this service. PSR ¶ 34(d). The only evidence of this was Rechnitz's testimony that Mr. Reichberg got some of his friends out of jury duty, but Rechnitz did not identify those friends.[2] We have examined Rechnitz and Mr. Reichberg's email

---

[2] Defense counsel specifically objected and asked that Rechnitz be required to identify on direct examination the people who Jeremy allegedly charged to get out of jury duty but the Court overruled this objection and the Government declined to ask who these individuals were. Tr. 2408-2410.

correspondence and have identified only one person about whom Rechnitz asked Mr. Reichberg whether she had to go to jury duty. Ex. I. That person, Kimberly Groggmarin, had a jury summons for August 4, 2009. *Id*. We subpoenaed Ms. Groggmarin's state court jury duty records which show that in fact she served that jury duty. *Id*.

Thus, as was the case with the traffic tickets, the official records establish that Rechnitz's story that Mr. Reichberg was getting people out of jury duty is false.

The second additional scheme which Mr. Reichberg allegedly participated in was bribing the Mayor and his fundraiser, Ross Offinger.

The PSR states that "Reichberg and Rechnitz reached an explicit agreement with a fundraiser for then candidate for New York City Mayor Bill de Blasio to raise tens of thousands of dollars for his campaign and, later, other pet political projects of the Mayor." PSR ¶ 34(b). "In exchange, Reichberg and Rechnitz," supposedly, "demanded and received favorable treatment from the City when requests were made… including from the Department of Buildings." *Id*.

However, the evidence at trial proved that on the four items on which Mr. Reichberg or Rechnitz, needed help with city bureaucracy, Ross Offinger was no help. First, Rechnitz testified that he asked Mr. Reichberg to get his cousin Ruthie a permit for her school. When they reached out to Offinger, he declined to help, saying instead that "you have to understand at this point how slow the city moves on stuff, it's been over to the DOB for a look, I'm not optimistic based on my previous interactions with that agency."  Tr. 3840-3841.

Second, Rechnitz owned a building at 230 Madison with violations from both the Environmental Control Board and Housing Preservation and Development. With respect to the ECB violations, Rechnitz actually paid a fine of $100,000 to clear up those violations. Tr. 3806. Similarly, with respect to the HPD violations, Rechnitz's company paid the fee required by the City, and had an inspector come and inspect the building. Tr. 3807-3810. In neither case did Mr. Offinger have the violations removed.

Third, Mr. Rechnitz had different friends who wanted help with either zoning or real estate issues in the City. Mr. Rechnitz testified that on these occasions the individuals came to him asking for help, and he tried to get the Mayor or Offinger to help but got nowhere. Tr. 3779-3781, 3842-3845. Indeed, Rechnitz admitted that "as of October 2014 [he] said to Ross even though you had promised me before [I] would have results, [I have] not had any results." Tr. 3850.

Immediately thereafter, a friend of Rechnitz's, Mr. Skydell, approached Rechnitz and said he had been overcharged by hundreds of thousands of dollars on his water bill. Tr. 3852. Rechnitz said that he tried to talk with Offinger about this but nothing happened "and then I told Jeremy to deal with it." Tr. 3852. It took Mr. Reichberg six months to get the water bill fixed and Rechnitz testified that "I don't know how Jeremy got it done." Tr. 3854.

Moreover, Rechnitz testified that even though he gave over $100,000 to the Mayor and the Mayor's charities, Rechnitz did not know of the Mayor causing any city agency to do anything on Rechnitz's behalf. Tr. 3857. Rather, what Rechnitz got

from giving all this money to the Mayor, according to his testimony, was to look "like a big shot" and getting access to talk with the Mayor about policy issues. But Rechnitz admitted, that at no point did the Mayor help with any of Rechnitz's city projects. Tr. 3860-3861.

Thus, the claim in the PSR that Reichberg "demanded and received" favorable treatment from the City because of the donations given by Rechnitz to Mayor de Blasio is again contradicted by the evidence.

Finally, the PSR claims that Reichberg participated in a scheme to bribe Norman Seabrook. In return, $30,000 was allegedly paid to charitable entities on Reichberg's behalf, PSR ¶ 34(a).

This conclusion once again contradicts the evidence. At trial, Rechnitz admitted that Seabrook stated that he did not trust Reichberg to be part of a bribery scheme and instructed Rechnitz not to discuss the matter with Mr. Reichberg. Tr. 3305. Nor was there even any evidence that $30,000 was paid to charity on Mr. Reichberg's behalf. While the Government was easily able to prove what charitable contributes were made on Rechnitz's behalf, no evidence was ever introduced of contributions to charities on Mr. Reichberg's behalf. This absence of evidence is telling. Mr. Reichberg did not receive any money for the Seabrook bribe, directly or indirectly, because he was never part of this bribery scheme.

In sum, the evidence at trial showed improper use of police department assets. It also showed unseemly amounts of money being lavished by Rechnitz on

public officials. But, we submit, it did not show a massive bribery scheme. At most, it showed low-level petty bribery of police officials.

### III.   <u>GUIDELINES CALCULATION</u>

The PSR provides the following Guidelines calculation:

- The Guideline applicable to Counts 1, 2, and 3 is §2C1.1.[3]

- 12 points is the Base Offense Level: U.S.S.G. §2C1.1(a)(2);

- A 2-point enhancement for multiple bribes. §2C1.1(b)(1);

- A 10-point enhancement because the value of the bribes was over $150,000. §2C1.1(b)(2);

- A 4-point enhancement because the offense involved a public official in a high-level decision-making or sensitive position. §2C1.1(b)(3);

- A 2-point enhancement for being an organizer or leader of the criminal activity. §3B1.1(c); and

- A 2-point enhancement for obstruction of judgment. §3C1.1.

- The total Guidelines offense level is 32 for a range of 121-151 months.

We object to two of these enhancements: (1) the §3B1.1(c) two-point enhancement for being a leader or organizer; and (2) the ten-point enhancement based on the value of the bribes—instead we think the proper amount is more than $6,500 but less than $15,000 for a two-point enhancement. The Total Offense Level is therefore 22, for a range of 41-51 months.

---

[3] The Guideline for Count 7 (Obstruction of Justice) is §2J1.2. As Mr. Reichberg was convicted of both obstruction and the underlying offense of bribery, however, the two convictions are grouped together under §3D1.2(c) and the "offense level for that group … will be the offense level for [Bribery] increased by the 2-level adjustment specified by [§3C1.1]. §3C1.1 App. Note 8.

### A.   Mr. Reichberg was Neither a Leader Nor Organizer of the Criminal Enterprise

The PSR recommends a two-point enhancement because Mr. Reichberg was allegedly an organizer or leader of the criminal activity in this case. PSR ¶ 47. We object to this enhancement because the government cannot carry its burden of showing that Mr. Reichberg "'exercised some degree of control over others involved in the commission of the offense … or played a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Russell*, 513 F. App'x 67, 69 (2d Cir. 2013) (ellipsis in the original; quoting *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002)).

Mr. Reichberg exercised no degree of control of the other participants in the bribery scheme—whether over Rechnitz or the various police officers. Rather, the evidence shows that the bribery conspiracy "developed into a corrupt enterprise with all of the parties more or less equally involved." *United States v. Frega*, 179 F.3d 793, 811 (9th Cir. 1999). As to the police officers, Mr. Reichberg had no control over them at all and "was in no position to coerce any of the [officers] into rendering favorable decisions." *Id.* In fact, the evidence showed that Mr. Reichberg was often unsuccessful in obtaining the desired *quo*. The same is true with regard to Rechnitz—there was no evidence that Mr. Reichberg exercised any control over him. In fact, the vast majority of money spent during this conspiracy was Rechnitz's—

and Mr. Reichberg had no ability to coerce Rechnitz to spend it. The Government

has told us it believes that the fact that there is evidence in the record that Mr.

Reichberg directed how the money Rechnitz provided should be spent on police

officers indicates that Mr. Reichberg had a supervisory role. But that does not

follow—all it indicates is that each played a distinct role in the conspiracy.

Nor was there any evidence that Mr. Reichberg recruited any other members

of the conspiracy. The government has told us it will argue that Mr. Reichberg drew

Rechnitz into the conspiracy. The trial testimony, however, contradicts that

contention. As discussed above, Rechnitz testified that he was introduced to Mr.

Reichberg by a friend after he asked that friend how he could get a special parking

permit. Tr. 2383–2391. And Rechnitz contributed $5,000 to the NYPD football team

in order to get a parking placard prior to attending to the fundraiser where he first

met Mr. Reichberg. Tr. 2388–2389. Similarly, there is no evidence that Mr.

Reichberg recruited any police officers into the conspiracy. Rather, those

relationships began as friendships that existed years before any bribes were

provided or solicited and only became corrupted after Rechnitz joined the picture.[4]

### B.  The Court Should Use a Valuation of Between $6,500 and $15,000 as the Proper §2C1.1(b)(2) Enhancement in this Case

The PSR puts the value of the bribes in the case at more than $150,000. We

believe, as discussed briefly at the end of this section, that number overstates the

---

[4] We note that Mr. Reichberg cannot get a supervisory role enhancement for his role in obstructing justice—or, more accurately, any such enhancement would be irrelevant. As discussed, under §3D1.2(c), Mr. Reichberg's bribery and obstruction convictions merge for guideline purposes. Therefore, under §3D1.3(a), the group offense level is determined based on "the most serious of the offenses comprising the Group"—in this case, the bribery counts.

value of bribes in this case. More fundamentally, we do not believe that number accurately captures either Mr. Reichberg's increased culpability or the harm to the public in this case. Rather, we submit that a valuation of between $6,500 and $15,000—a two-point enhancement, *see* §2B1.1(b)(1)(B)—more accurately captures those factors for two reasons.

        1.     *The proper §2C1.1(b)(2) valuation is between $6,500 and $15,000.*

The Court should use a valuation of between $6,500 and $15,000 as the 2C1.1(b)(2) calculation in this case for multiple reasons. First, it is not disputed that the overwhelming majority of benefits provided to police officers were paid for by Rechnitz, not Mr. Reichberg. *See* Tr. 2399 (Rechnitz testifying that "[b]asically anything that would cost money, for the most part, I was the one that would pay"). The only benefits there is any evidence that Mr. Reichberg personally paid for—and that are thus indicative of Mr. Reichberg's increased culpability—are: (1) meals with police officers, which Mr. Reichberg occasionally paid for, Tr. 2464; (2) the earrings given to Grant's wife on Christmas, Tr. 2433; and (3) the windows for Grant's home in States Island. Tr. 471. There is limited evidence in the record as to the cost of the meals—especially the ones Mr. Reichberg paid for. *See* Tr. 2663 (Rechnitz testifying that the meals cost "[a]nywhere between 50 to 100 dollars a head"), and no evidence as to the cost of the earrings. The cost of the windows was somewhere between $5,000, *see* Tr. 291, 300, GX 927, and $8,000. Tr. 350. So while the total value of the benefits Mr. Reichberg personally provided is not calculable

"with certainty or precision[,] … "a reasonable estimate," U*nited States v. Bahel*,

662 F.3d 610, 646 (2d Cir. 2011) of the benefits is between $6,500 and $15,000.

Second, and separately, we believe that a reasonable estimate of the value of

the *quo*s received by Mr. Reichberg and Rechnitz is between $6,500 and $15,000. In

summation, the government argued the co-conspirators had received six *quo*s:

1. Approving a gun license application;
2. Promoting or transferring a police officer;
3. Making an arrest as well as making a decision about whether to issue a desk appearance ticket to an arrestee;
4. Authorizing the use of a police helicopter for a particular occasion;
5. Authorizing the use of a police boat for a particular occasion; and
6. Deploying a police escort for a private citizen and/or transporting a private citizen in a police car.

Tr. 6618 (jury charge); *accord* Tr. 6729 (government summation).

The government agreed, as part of its plea deal with Michael Harrington,

that the value of the last three *quo*s was less than $6,000. *See* Sentencing of

Michael Harrington, June 13, 2018, Tr. 74.[5]

As to *quo*s 1 and 3, the jury apparently did not accept these allegations, as it

acquitted Mr. Grant on all counts and Mr. Reichberg of Count 4. Assuming,

however, that the Court should include their value in its guideline's valuation, we

submit that a reasonable estimate of the value of the gun license is approximately

$1,000–$2,000.[6] And while the value of a DAT is obviously hard to calculate, there

---

[5] The total value of Mr. Harrington's misallocation of NYPD resources was $6,000 but some of that money was used for purposes other than the *quo*s mentioned above. *See* Plea Allocution of Michael Harrington, March 1, 2018, Tr. 27–29.

[6] David Villanueva testified that he twice received $500 from Frank Sohoo for helping him obtain gun licenses. Tr. 1408. While the record is somewhat confusing, it appears that at least one of those bribes was simply for a license upgrade. The value of an initial license may thus be somewhat higher than $500. Villanueva also testified that he once received

was evidence that Mr. Reichberg charged someone $2,500 to try to facilitate his early release from jail. Tr. 348. We submit that the Court could use this price as a stand-in for the value of receiving a DAT.

As to the promotion or transfer of officers, we do not believe the government ever proved that Mr. Reichberg successfully effectuated either any promotions or transfers and that all its supposed evidence was a classic example of the *post hoc ergo propter hoc* fallacy. But even assuming it was proven, it was not a *quo* Mr. Reichberg personally received and therefore should not be included when calculating the value of the benefits he received. Further assuming *arguendo* they should nevertheless be included in the calculation, we do not believe there was any evidence of their value in the record but submit the Court could estimate their value at a few thousand dollars.

In short, the best estimation of the value of the government benefits improperly received by Mr. Reichberg is between $6,500 and $15,000. This is also an accurate measure of the harm to the public from being defrauded of public resources.

> ## 2. *The Government's valuation of more than $150,000 overstates the harm to the public in this case*

We believe that an enhancement based on a bribe amount of $150,000 substantially overstates the actual harm to the public in this case. It is true that the

---

$10,000 to provide a gun license to someone who was "federally barred from having a firearm." *Id.* We submit that this shows that the value of a gun license for Mr. Reichberg, who was not barred from owning a gun, was substantially less than $10,000. *See also* Reichberg Letter, Dkt. #496. We therefore believe that between $1,000–$2,000 is a reasonable estimate of the value of Mr. Reichberg's gun license.

Commentary to the Guidelines provides that "[i]n a case in which the value of the bribe exceeds the value of the benefit … the value of the bribe is used." §2C1.1 Commentary Background. But neither of the two reasons given for this general rule apply to the facts of this case.

First, the presumption that "*it is likely* that the payer of such a bribe expected something in return that would be worth more than the value of the bribe," *id.* (emphasis added), does not carry much weight in a case like this where the value of the benefits was so far in excess of anything received in return. In fact, the Commentary to the original Guidelines expressly noted that "[t]he amount of the bribe is used as a factor in the guideline *not because it directly measures the harm to society*, but because it is improbable that a large bribe would be given for a favor of little consequence." U.S. Sentencing Commission, Guidelines Manual §2C1.1 Commentary (background) (1987) (emphasis added). But as the Government itself acknowledged, both Mr. Reichberg and Rechnitz had mixed motives for the benefits they conferred on police officers. For example, they surely did not agree to raise "tens of thousands of dollars" in campaign contributions "chief[ly]" for the purpose of receiving "parking placard[s]". PSR ¶34(c). It thus it makes little sense to include the entire value of all the benefits provided—even those given largely so Rechnitz could appear like a big shot, *see, e.g.*, Tr. 2658–89—when calculating the value of the bribe.

Second, while it may be proper, "for deterrence purposes," for the bribe valuation to "be commensurate with the gain to the payer or the recipient of the

bribe, whichever is greater," §2C1.1 Commentary Background, when determining the appropriate punishment for the public official who received the bribe and violated his oath to work in the public interest, it does not when determining the appropriate sentence for the payor. What logic is there in punishing Mr. Reichberg based on a valuation that is higher than either his profit from the crime or the harm the public suffered when it was defrauded of the honest service of its employees?

Moreover, there is a unique reason the actual value of the benefits provided to the officers is a misleading way to estimate the public harm in this case: Rechnitz often intentionally hid, or understated, the value of the benefits he was providing to the police officers. For example, Rechnitz testified that he believed that when he provided Grant a hotel room in Italy, he told him he owned the hotel. Tr. 2831. He also removed the price of the room from the invoice he had emailed to Grant because he had given Grant "the impression that I got [the room] for free." Tr. 2834. Similarly, Rechnitz testified, regarding the hotel rooms he provided Harrington in Chicago, that he may have told Harrington that he got them "for free on a trade." Tr. 2905. He did this because Harrington "was very uncomfortable accepting gifts." *Id.* Rechnitz also testified that he often told the people he was taking on plane rides with him that he owned the private jet they were flying on. Tr. 3290. *See also, e.g.*, Tr. 3875 (Rechnitz testifying that he "may have" told the officers that he owned the building where he hosted a New Year's Eve party).

To be clear, we are not suggesting that these benefits would have no value if, in fact, Rechnitz had not paid for them out of his own pocket. But in determining

whether the value of the bribe is a good stand-in for what the payor expected to receive in return or the benefit the public official was likely to confer it would be misleading to use the full value of the benefit provided where the payor intentionally hid the true value of the benefit from the other participants in the scheme.

More generally, using the total value of the bribes given would substantially increase the sentencing range Mr. Reichberg faces based on facts not found by the jury. In fact, the additional 8 points the government is seeking under §2C1.1(b)(2) raise the guideline range by approximately 70 to 90 months. And while it is true that under current doctrine this does not violate the Sixth Amendment,[7] it is nevertheless "a dubious infringement of the rights to due process and to a jury trial." *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring). Then-Judge Kavanaugh noted, moreover, that "district judges have power in individual cases to disclaim reliance on acquitted or uncharged conduct." *Id.* Of course, district courts "may have to factor in relevant conduct, including acquitted or uncharged conduct" when initially calculating the guidelines. "But those Guidelines are only advisory … [and] district judges may then vary the sentence downward to avoid basing any part of the ultimate sentence on acquitted

---

[7] We preserve for appeal the claim that increasing the guideline range based on facts not found by a jury does violate the Sixth Amendment. *See Jones v. United States*, 135 S. Ct. 8, 8 (2014) (Scalia, J., with whom Justice Thomas and Justice Ginsburg join, dissenting from denial of certiorari) ("It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury.").

or uncharged conduct." *Id.* If the Court uses, our proposed valuation of between $6,500 and $15,000, it would largely obviate this issue.

Finally, even if the Court rejects these arguments and believes that it should use the full value of the benefits conferred in determining the §2C1.1(b)(2) enhancement, we believe the government's estimation that the value was over $150,000 is too high. While we do not know, at this point, exactly how the government reached that number, it is apparently based in large part on the various vacations and plane rides Rechnitz provided to certain police officers. We think this calculation is nevertheless too high for two reasons. One, as Rechnitz acknowledged, once he had already paid for the private jet, it cost him nothing to bring additional people on the flight. Tr. 3921. And he also testified that Mr. Reichberg asked if he could bring some police officers on the flight to Las Vegas *after* Rechnitz had already booked the private jet. *Id.* So the proper valuation of this bribe is not the entire cost of the private jet but, at most, the price of two tickets to Las Vegas for Grant and Milici—a substantially smaller sum. In addition, and maybe for this exact reason, the jury did not find the Vegas trip to have been a bribe. Second, it is not economically accurate to describe the entire cost of these trips as bribes to the police officers. For example, Rechnitz testified that the entire trip to Israel with Reichberg, Seabrook, and Banks cost him about $50,000. Tr. 2430. Obviously, though, not all the money was spent on Banks—the other three participants also benefited from the vacation. In fact, Banks, unlike the other three, paid for his own ticket. Tr. 4167 (Rechnitz testifying that Banks "wanted to pay for

his own plane ticket, which he did"). Less than a fourth of the $50,000 spent on the trip overall should thus be considered a bribe to a police officer.[8] The same is true of the two trips to the Dominican Republic—only part of the expense of the trip went to pay for a police officer's vacation.

## IV.    THE COURT HAS BROAD SENTENCING DISCRETION

Whatever the exact guideline calculation in this case, it is now established that the Guidelines are not binding. *See generally United States v. Booker*, 543 U.S. 220 (2005). And while the Sentencing "Guidelines remain the starting point and the initial benchmark for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court must make an individualized assessment based on the facts presented and the other statutory factors." *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (internal quotation marks omitted). In fact, the Supreme Court and Second Circuit have repeatedly stressed that a district court cannot and must not presume that a sentence within the applicable guidelines range is reasonable. *See Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) ("A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense."). *See also Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (holding that sentencing courts "may vary from Guidelines ranges based

---

[8] Separately, the money Rechnitz spent on Seabrook may well have been part of his separate honest service fraud conspiracy with Seabrook to defraud COBA. But, as discussed above, Mr. Reichberg was not charged—and played no role—in that crime.

solely on policy considerations, including disagreements with the Guidelines")
(internal brackets omitted). Rather, the sentencing guidelines now just are "one
factor among several courts must consider in determining an appropriate sentence"
that is compliant with "§3553(a)'s overarching instruction to 'impose a sentence
sufficient, but not greater than necessary' to accomplish the sentencing goals
advanced in § 3553(a)(2)." *Id.* at 111; *accord United States v. Hoskins*, 905 F.3d 97,
104 (2d Cir. 2018). As stated by the Second Circuit in a recent case, "every
Guidelines sentence is limited by § 3553(a)'s 'parsimony clause,' which instructs a
district court to impose a sentence 'sufficient, but not greater than necessary' to
achieve § 3553(a)(2)'s goals [and means] courts are required to carefully consider on
an individualized basis 'the nature and circumstances of the offense and the history
and characteristics of the defendant.' 18 U.S.C. § 3553(a)(1)." *United States v.
Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017). Consequently, any sentencing
determination in this case that were to place undue weight on the guidelines and
that did not give sufficient attention to the specific facts of Mr. Reichberg's case
would be procedurally unreasonable. This is particularly here where the Court,
having presided over a lengthy trial, "has greater familiarity with the individual
case and the individual defendant before him than the Commission" and "is
therefore in a superior position to find facts and judge their import under § 3553(a)."
*Kimbrough*, 552 U.S. at 109 (internal quotation marks omitted).

These fundamental post-*Booker* sentencing principles are especially
important in the sentencing of white-collar offenders like Mr. Reichberg. As a

number of courts have noted, the guidelines applicable to fraud, bribery and other like economic offenses, because they have numerous overlapping enhancements and give undue significance to dollar amounts absent relevant context, can often produce advisory sentencing ranges that are indisputably far "greater than necessary" and lack any common sentencing wisdom. *See, e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (complaining that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"), *aff'd* 237 Fed. App'x 713 (2d Cir. 2008).

In fact, the Second Circuit has held that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement,"—as is the case here—"that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). In short, it is clear that

the Court is in no way bound or restricted by the draconian guideline range in this case.

## V.   BOTH NATIONAL AND LOCAL COURTS ROUTINELY VARY DOWN FROM THE BRIBERY GUIDELINES

Of particular relevance to this case, in 2017, bribery had the second-lowest rate of within-guideline-range sentences of all major offense types at 23.2%. Only antitrust cases had a lower rate, at 22.6%. By comparison, across all case types, 49.1% of defendants received in-range sentences, while fraud cases were sentenced within-range 42.8% of the time. U.S. Sentencing Commission, 2017 Sourcebook of Federal Sentencing Statistics tbl. 27A (2018), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf. *See also id.* at tbl. 28 (of the 204 sentences imposed under §2C1.1, only 45 were within the guideline range).[9] In short, sentencing judges in determining the appropriate sentence, have found §2C1.1 to be an unreliable, and over-harsh, Guideline.

This nation-wide pattern is true of recent sentences for bribery convictions in this District, as well. As is apparent from the attached appendix created by our office, the majority of sentences imposed on recent bribery convictions in this

---

[9] Moreover, from 2003 (the year before *Blakely* and then *Booker* began untethering judges from the guidelines) until 2017, guidelines adherence for bribery cases fell by 46.2%, farther than all but one other primary offense category (that being pornography at 48%). *Compare* U.S. Sentencing Commission, 2003 Sourcebook of Federal Sentencing Statistics tbl. 27A (2004) *with* U.S. Sentencing Commission, 2017 Sourcebook of Federal Sentencing Statistics tbl. 27A (2018). And "[d]uring the past five years, the rate of within range sentences for bribery offenses has decreased from 30.0% in fiscal year 2013 to 21.3% in fiscal year 2017." U.S. Sentencing Commission Quick Facts—Bribery Involving Public Officials (internal parenthesis deleted).

District were well below the guideline range. For example, Ng Lap Seng received a sentence of 48 months, notwithstanding his guideline range of 235–293 months;[10] and Dean Skelos received a sentence of 51 months, notwithstanding his guideline range of 151–188.[11] Similarly, Louis Ciminelli, whose guidelines were 108–135, was sentenced to 28 months[12] and Alain Kaloyeros, whose guidelines were 135–168, was sentenced to 42 months.[13]

This disparity between the recommended guideline ranges and the sentences actually imposed by courts is relevant for two reasons. First, "[a] principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018) (internal quotation marks omitted). A rigid adherence to the recommended guidelines in this case, however, would defeat this purpose of the Guidelines and create the very disparity the Guidelines were intended to prevent.[14]

---

[10] Ng was a real estate developer who paid more than $1 million in bribes to senior United Nations ambassadors in exchange for their endorsement of a prospective luxury real estate development project in Macau.

[11] Skelos was the New York State Senate Majority Leader who leveraged his political position to obtain over $300,000, often in the form of commissions for his son, from companies seeking legislative endorsements and bidding advantages.

[12] Ciminelli was the owner of a Buffalo construction company, LPCiminelli, who rigged the bidding process for upstate development contracts by working with program-administrator Alain Kalyeros to steer $750 million in contracts to LPCiminelli, retaining $26.25 million as a management fee.

[13] Kaloyeros was a SUNY college president who steered more than $850 million in upstate development contracts to contractors favored by his lobbyist.

[14] *Cf. Gupta*, 904 F. Supp.2d at 351 ("Another example of the deviation of the Guidelines from the original goals of the Sentencing Commission—and one more directly relevant to the instant case—is the huge, increase in the recommended Guidelines sentences for securities fraud cases. The Guidelines calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.").

Second, and relatedly, Congress had mandated that courts consider, in imposing a sentence "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

We believe that a survey of recent, similarly situated defendants, further shows that a substantially below-guideline sentence is appropriate in this case. We discuss two bribe-related groups of similarly situated defendants: (1) those who were recently convicted of conduct with regards to the NYPD Gun License Division and (2) those involved in the Buffalo Billions conspiracy.

To date, three defendants have been sentenced for bribery convictions related to the NYPD Gun License Division, conduct which is, in part, similar to that charged in this case.[15] The sentences they received are: John Chambers—a year and a day;[16] Shaya Lichtenstein—32 months;[17] and Paul Dean—18 months.[18]

Another group of similarly situated defendants are those from the Buffalo Billions conspiracy. *United States v. Percoco, et al.*, 16-cr-776 (VEC). In particular, three of the defendants in that case were, like Mr. Reichberg, neither public officials nor fiduciaries. The sentences they received are: Steven Aiello—36 months, Joseph

---

[15] David Villanueva and Richard Ochetal have yet to be sentenced.

[16] Chambers was an attorney who represented clients seeking expedited gun licenses. He bribed officers in the Gun License Division of the NYPD in exchange for expedited license renewals or favorable investigative outcomes for dozens of clients.

[17] Lichtenstein was a gun license "expediter" who charged clients hundreds of thousands of dollars in total for expedited gun license approvals, which he obtained by offering bribes worth tens of thousands of dollars to officers in the NYPD's License Division.

[18] Dean was an NYPD License Division supervisor who accepted bribes from gun license "expediters" to expedite applications, approvals, and renewals.

43

Gerardi—30 months,[19] and Louis Ciminelli—28 months. Appendix. *See also* U.S. Sentencing Commission Quick Facts—Bribery Involving Public Officials, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery_FY17.pdf ("The average sentence length for bribery offenders was 26 months."). They received these well-below guideline sentences notwithstanding the fact that their businesses received millions of dollars in management fees as a result of the bribes they gave. *See, e.g.,* Government Sentencing Submission, *United States v. Steven Aiello*, 16-cr-776, Dkt. #911, p. 5. The benefits Mr. Reichberg received as a result of this scheme pale in comparison to those fees. Mr. Reichberg is thus less culpable than those defendants and should receive a lesser sentence than them.

We note one other group of persons that the Court should consider in determining the appropriate sentence in this case. The Government has alleged that the charged conspiracy had at least 13 members—11 police officers, *see* PSR ¶¶ 23–31; Amended Bill of Particulars, Dkt. # 380, and Messrs. Reichberg and Rechnitz. Excluding Rechnitz, who has yet to be sentenced, *not a single one* of Mr. Reichberg's co-conspirators will spend a day in prison. Nine of the officers were never charged. One—James Grant—was acquitted. And one—Michael Harrington—pleaded guilty and received a probationary sentence. Mr. Reichberg, on the other hand, is facing a substantial prison sentence, even though "'offenders who abuse

---

[19] Aiello and Gerardi were co-owners of a Syracuse real estate development company, COR Development, who rigged the bidding process for upstate development contracts by working with program-administrator Alain Kalyeros to illicitly steer $105 million in contracts to COR, retaining $8.4 million as a management fee.

their positions of public trust are inherently more culpable than those who seek to corrupt them … .'" *United States v. Roussel*, 705 F.3d 184, 197 (5th Cir. 2013) (quoting U.S. Sentencing Guidelines Manual app. C, amend. 666, reason for amendment (2004)). While these unindicted co-conspirators technically do not fall within the ambit of § 3553(a)(6), the Court should still consider whether Mr. Reichberg's "advisory Guidelines range [i]s too high to permit differentiation between Defendant and more culpable, unindicted co-conspirators." *United States v. Jimenez-Gutierrez*, 491 F.3d 923, 926 (8th Cir. 2007).

Given the general pattern of below-guideline sentences in bribery cases, as well as Mr. Reichberg's diminished culpability relative to the above-discussed similarly-situated defendants, we respectfully submit that a sentence of between 6–12 month's incarceration is sufficient, but not greater than necessary, to serve the goals of § 3553(a).[20]

---

[20] We note that a lengthier prison sentence is not necessary for deterrence purposes. In fact, there is little evidence that long prison sentences deter crime. *See, e.g.*, Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); A. Mitchell Polinsky & Steven Shavell, On the Disutility and Discounting of Imprisonment and the Theory of Deterrence, 28 J. Leg. Stud. 1, 12 (1999). Not surprisingly, then, the Sentencing Commission's original goal was to assure a "short but definite period of confinement' for white collar offenders" U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform (November 2004), available at www.ussc.gov/15_year/15year.htm.

## CONCLUSION

We respectfully request that the Court sentence Mr. Reichberg to between 6–12 months' incarceration.

Respectfully submitted,
Hafetz & Necheles LLP

_____/s/_____

By:   Susan R. Necheles
Gedalia M. Stern
10 East 40th Street, 48th Floor
New York, NY 10016
(212) 997-7400

*Attorneys for Defendant Jeremy Reichberg*