UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                            :

JEREMY REICHBERG,                           :          16 Cr. 468 (GHW)

                                :

                    Defendant.

                                :
-------------------------------------------------------------x


## GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America


Martin S. Bell
Jessica Lonergan
Kimberly J. Ravener
Assistant United States Attorneys
- *Of Counsel* -

Defendant Jeremy Reichberg is to be sentenced on April 4, 2019 after having been found guilty after trial of bribery and honest services fraud offenses, and obstruction of justice.  The Government respectfully submits this memorandum in connection with the sentencing, and in response to the defendant's sentencing submission, received on March 20, 2019 ("Def. Mem.").

## PRELIMINARY STATEMENT

For well over half a decade, graft was a way of life for Jeremy Reichberg.  In matters large and small, professional and personal, Reichberg took advantage of opportunities to grease the palms of the powerful in order to get what he wanted for himself, his clients, his associates, and his friends.  Most notably, Reichberg engaged in a scheme that lasted for at least eight years to cultivate a network of elite members of the New York City Police Department ("NYPD") who would do his bidding and that of his associates.  Together with Jona Rechnitz, Reichberg used gifts and favors to piece together an elite cadre of police officials who were at his beck and call. As proven at trial, and as a direct result of Reichberg's efforts, important facets of police work effectively came to bear "For Sale" signs, among them:  the deployment of police manpower; determinations concerning whether to effect an arrest; the process of awarding gun licenses to New Yorkers; the use of NYPD cars, boats, and even aircraft.  And paired with Rechnitz's seemingly bottomless bank accounts at the time, Reichberg's ambitions were limitless.  His scheme targeted numerous high ranking officers within the Department. Through these men, and the people whom these officers influenced by virtue of their rank, Reichberg became, for all practical purposes, a powerbroker in NYPD circles.  Tellingly, shortly after news of Reichberg's arrest broke, then-NYPD Commissioner Bill Bratton stated publicly that "you'd probably have to

go back to the Knapp Commission days" to find a scandal of this dimension within the annals of the NYPD.[1]

To fashion a sentence that properly reflects "the nature and circumstances" of the offenses requires recognizing the rare and uniquely pernicious nature of Reichberg's conduct. To craft a punishment that reflects "the history and characteristics of the defendant," requires, in turn, a realization that none of what Reichberg did was out of character. As proven at trial, Reichberg's scheme was composed of a years-long series of asks, offers, and gifts. Rather than being irregular events, it was Reichberg's norm to engage in the fattening of cops' pockets and calling upon them for favors. And, as the testimony of Rechnitz, called as a cooperating witness, revealed, this prolonged and unhesitating manner of using money to do business with public officials was not limited to the world of policing. Reichberg played a role in the corruption of Norman Seabrook, the president of the correction officer's union, who betrayed his union for the promise of tens of thousands of dollars, garnered contacts with local government officials through the promise of donations in exchange for action and responsiveness, and even assisted prospective jurors in skirting their obligations to serve. To credit the evidence of this other conduct, even in part, is to determine that the bribery offenses were not a one-time error in judgment, but consistent with the way in which Reichberg lived his life more generally. And as Reichberg—accurately, as it turned out—sensed the law closing in, he ended things by committing one more crime: obstructing justice by seeking to obscure evidence of his criminal scheme.

---

[1] *See*, Cohen, Shawn and Bruce Golding, "Bratton admits NYPD corruption scandal is historically bad," *The New York Post*, Apr. 14, 2016, https://nypost.com/2016/04/14/bratton-admits-nypd-corruption-scandal-is-historically-bad/ (*last accessed March 25, 2019*).

Individuals who commit crimes are, of course, far more than the worst thing they have ever done.  But after a long trial airing of Reichberg's phone calls, emails, text messages, and testimony from his close friend and partner in crime—it has become clear that Jeremy Reichberg, through his consistent and willful actions, was a criminal.  A family man to those who knew and loved him, assuredly, and a friend to some in the community, but a criminal.  Link by link, bribe by bribe, year by year, Reichberg forged and nurtured a network of illicit relationships with NYPD officials.  He broke the law not as a fleeting misstep but as a go-to career-building technique.

Rather than take the opportunity to express genuine and meaningful remorse, Reichberg's sentencing submission is a prolonged attempt to relitigate a trial that, however hotly contested, ended with twelve jurors unanimously convinced of his guilt on the four counts of conviction.  The proceeding scheduled for April 4, 2019 is not an invitation to revive evidentiary disputes.  It is solely about what Jeremy Reichberg did, and what the appropriate punishment is under the law—particularly in light of the need to send a strong message to those who might consider engaging in such audacious and thoroughly corrupt schemes in the future.  The Court needn't resolve—or re-resolve—all or even most of these disputes.  That is not to say that the trial record, as cited throughout this memorandum, is not sufficiently clear as to provide a basis for any resolution.  But the Court need not engage each of these issues because the thrust of what was demonstrated at trial is clear regardless of how any single disputed point is settled:  Reichberg's scheme was real, it was broad, it was sustained, and it is worthy of a strong message from the Court through its sentence.

For his crimes, Reichberg faces an advisory Guidelines range of 121 to 151 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office")

Presentence Investigation Report ("PSR").  The Probation Office recommends a sentence of 72 months' imprisonment, noting "significant" underlying conduct that represented a significant breakdown and stressing that "the need for specific and general deterrence is paramount."  (PSR at 26).  Reichberg, for his part, requests a sentence of 6 to 12 months' incarceration.  The Government respectfully submits that this suggested sentence is clearly inappropriate given the nature, scope, duration, and reach of Reichberg's crimes.  Instead, we respectfully submit that a more meaningful sentence of incarceration, such as the 72 months' imprisonment recommended by the Probation Office, would be sufficient but not greater than necessary to provide just punishment, to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to others who might make the same destructive choices.

## **BACKGROUND**

### I.    **The Defendant and the Offense Conduct**

During the period of the charged conduct, Reichberg lived in a substantial home in Borough Park, Brooklyn, with his family.  He and Jona Rechnitz spent tens of thousands of dollars buying capital with police officers, such that they could call upon them for police action as needed.  And he was a magnet for the sort of police officer who was willing to accept substantial gifts from him, and for people in the community who wanted more from the NYPD than an ordinary citizen had any right to expect.

To Rechnitz, whose very entrée to meeting Reichberg involved giving thousands of dollars to a pet interest of the NYPD (Tr. 2383-89), Reichberg was the brains of their criminal partnership, the keeper of the relationships with their officer targets, and the source of entreaties to give yet another gift to a rising star within the NYPD who had been "good to [them]".  (Tr.

2400, 2550, 2687).  Reichberg was in the business of charging individuals who needed help with the police and other corners of government.  (Tr. 2397).  He secured that responsiveness from members of the NYPD by lining their pockets with financial benefits over the course of years— aided by Rechnitz, who had significant personal wealth and was easily able to provide the lion's share of the financial benefits.  While Rechnitz was the "money man," Reichberg was the "detail man."  (Tr. 2399, 2402).  As Rechnitz described it, Reichberg "was involved with all the details of anything that I or others needed that I brought forth his way, in addition to his own activities." (Tr. 2402).  Reichberg communicated with the police officers involving various gifts and various favors.  (Tr. 2402).  Reichberg's connections were sufficiently extensive that he saw the possibility to monetize them into substantial wealth.  He would tell Rechnitz that, "in the days of [former New York City Mayor] Rudolph Giuliani, people who were close to him in police made a fortune."  (Tr. 2403).

The police services Reichberg peddled and monetized were varied, and ran the gamut. As Rechnitz testified, "I remember [Reichberg] got a call once that somebody was in a holding cell in a police station, that he got out right away.  There were times that he had to arrange police escorts. There were times that he arranged access to the New York City Marathon with VIP seating for a parent of one of the runners.  Things of that nature."  (Tr. 2414-15).

Indeed, over the course of Reichberg's trial, the Government's evidence established a broad array of police services that Reichberg and Rechnitz combined to extract from members of the NYPD as part of the charged conduct.  Among these were:

- **<u>Gun licenses</u>**.  James Grant arranged for the approval of gun licenses by the NYPD's Gun License division at Reichberg's behest, chiefly by applying pressure on a lower-ranked officer within the division.  Former NYPD Sergeant David

Villanueva testified that he approved Reichberg's own gun license because Grant instructed him to and because another superior officer told him that Grant wanted it done. (Tr. 1492, 1918). Text messages and phone records demonstrated Grant's role in this process in August 2014. (GX 536A, 116A, 732, 811 1198). Judicially-authorized wiretaps captured Grant instructing Reichberg on how to fill out Rechnitz's application inaccurately in order to facilitate approval. (GX W311). Rechnitz also referred another named individual to Reichberg for purposes of assisting him in getting a gun license. (Tr. 2848-49).

- **Promotions and Transfers**. Reichberg sought and obtained the promotions and transfers of numerous officers, including officers who, as a result of their moves, became better positioned to assist Reichberg and Rechnitz as needed. The evidence at trial showed that Grant was one of these officers. (Tr. 2500-03, GX 552, 716, 815, 1180, 1181, GX W4804). The evidence at trial—consisting chiefly of text messages from Reichberg's own cellular phones—showed that Reichberg similarly obtained the transfers of NYPD officers including Anne Marie Guerra, Timothy Slattery, Anthony Nuccio, Kenneth King, and Joseph Marsella. (GX 761, 815).

- **Deployment of Police Cars, Boats, and Helicopters**. On numerous occasions, Reichberg called upon his cultivated circle of police officers in order to make private use of NYPD vehicles. Perhaps no example is more vivid than that of August 19, 2015, when Reichberg took advantage of what was supposed to be an event to advance the zoning interests of 601 Sunset LLC—an event for which he charged that entity thousands of dollars—and staged a barbecue for associates of

6

his, including local residents and police officers.  The claim that Reichberg's party actually was meant to advance the interests of the group that paid him is dubious, at best;[2] what *is* clear is that, with the assistance of Chief Michael Harrington, Executive Officer for the Chief of Department's Office, he secured a police boat to provide private tours of the East River and harbor area for barbeque guests, then secured the services of that same boat to circle a party boat for a *separate* social event later on that evening, and ordered a police helicopter to fly to Chelsea Piers to perform a flyover above the party boat.  (Tr. 4367-4373, 4385-4391; GX 503B-2 (private cruise invitation charging attendees $275), 503M-4 (video flyover footage with Reichberg's party attendees whooping and chanting "NYPD!  NYPD!  NYPD!"), 519K-2, 540, 553E, 812, 956).  Then-Inspector James Coan—called as a defense witness—testified on cross examination that Harrington, in making the request for a helicopter flyover, did not provide him with information about the nature of the cocktail party, any reason why a flyover was being requested, or any nexus to a viable law enforcement purpose.  (Tr. 6311-14, 6320-21).

On other occasions, Reichberg and Rechnitz had NYPD resources allocated to chauffeur civilians around for private purposes.  The evidence at trial demonstrated episodes involving police car rides provided for Lin Snider, the socialite Rechnitz sought to impress, (GX 1256 (recounting organizing the escort through Reichberg), Tr. 2547), and the nurse and close personal friend of

---

[2] Among other things, Reichberg lied to the NYPD crew aboard the boat and claimed that he owned the property.  (Tr. 4389).

Reichberg's whom he had Officer Michael Andreano shuttle to a nail salon, (GX 555B, 813).  There was similar testimony concerning Reichberg helping to arrange other rides.  (Tr. 2547).  Those escorts stand separate and apart from the evidence concerning the March 2008 Lincoln Tunnel ride that was also presented at trial. (Tr. 2209-2232, 2639-44, GX 917, GX 933, GX 935, GX 936).

- **<u>Arrests.</u>**  The evidence at trial further revealed Reichberg's efforts to arrange post-arrest interventions in the cases of Avi Zangi (through Grant) and Eddie Sankari (through Grant and former NYPD Inspector Steven McAllister).  Far from a private citizen who merely provided individuals with lawyers, Reichberg's own words made clear that he also worked with directly with police department officials in order to effect results.  (GX W1170) ("I got to work with the DA's office.  I got to work with the Police Department…").  The evidence at trial showed that he did so largely by leveraging the same contacts he and Rechnitz provided with gifts.  Grant pressured the duty Sergeant on Zangi's case to give him a desk appearance ticket.  (Tr. 194-220, DX 9509, GX W1170).  At Reichberg's direction, Grant and McAllister generated similar pressure on the officer on that case.  (GX 817, 116A, 129B, 504-W, 519L, 519M, 1717, Tr. 4941-4949).

How did a private citizen summon such a broad array of powers within the NYPD?  The simple answer was bribery.  The evidence at trial revealed a long trail of financial benefits, orchestrated by Reichberg, that made their way to the targeted officers contemporaneous with Reichberg and Reichnitz using those officers to accomplish their own, private ends.  Those gifts and benefits included, but were not limited to, the following:

- **The Trip to Las Vegas**.  The Court is, by now, particularly familiar with the trip to Las Vegas involving Reichberg, Rechnitz, two police officers, and a prostitute in February 2013.  (Tr. 533–57, 2691-94, 2815-28).  The flight alone cost $59,552.  (GX 924).   The luxury hotel costs came out to $5,380.  (GX 928, 600A-E; *see also* Tr. 548 ("[The suite] was like a mansion in a hotel.")).  Reichberg also arranged for the availability of a prostitute—an intangible benefit that was obviously not ordinarily available to police officials like Grant and the other officer.  On that trip, the prostitute's services were available to "anyone who asked."  (Tr. 550).

- **Trips to the Dominican Republic (November and December 2013) and Israel (March 2013) for Phil Banks**.  Banks received two flights to the Dominican Republic, one via private jet and one via commercial jet.  (Tr. 2429, DX JR 9999).

- **The Trip to the BCS Championship Game.**  Rechnitz flew police officers, including James McCarthy, Andrew Capul, and his son, along with former NYPD Inspector Steve McAllister (who would continue to marshal NYPD police resources on their behalf in retirement, as in the Eddie Sankari arrest) on a private jet to and from the 2013 BCS Championship Game in Florida.  (GX 1006, 1007, 924; Tr. 2920-28).  The travel, on this occasion, cost $38,189.64.  (GX 924).

- **The Harrington Trip to Chicago.**  In May 2014, Rechnitz, at the direction of Reichberg, paid for more than $5,000 worth of hotel rooms for Harrington, his friends, and his family in Chicago as they visited to watch the Chicago Cubs at iconic Wrigley Field.  (GX 1243, 1244, 1246; Tr. 2903).  The hotel rooms cost

approximately $400 per night.  Three rooms were reserved for four nights, and another was reserved for two.

- **<u>Vital Business for the Blue Guardian Security Company</u>**.  Reichberg steered over $60,000 worth of business to Blue Guardian, the security company affiliated with Michael Harrington and virtually all of the people closest to him.  (Tr. 861-63, 2914-17).  Overall, Reichberg was responsible for generating 100 percent of Blue Guardian's business.  (Tr. 878).

- **<u>The Rome Hotel Accommodations</u>**.  In August of 2013, Rechnitz paid for a luxury hotel room in Rome at Grant's request, at a cost to him of $1,066.  (GX 914).  The evidence at trial showed that Grant cancelled a hotel booking in order to receive this room, meaning that in addition to getting the room for free, he actually saved money that he otherwise would have had to spend.

- **<u>Grant's Railings</u>**.  In June of 2014, Grant received new stair railings at his home in Staten Island that had Rechnitz had paid for at Reichberg's direction.  They were worth $2,500.  (GX 925; Tr. 2552, 4284).

- **<u>Grant's Windows.</u>**  In October of 2013, Grant was likewise provided with new windows for his home.  They were valued at $5,388 and their installation required some $8,000 worth of work.  (GX 927; Tr. 360).

- **<u>Banks' "Investment" with Rechnitz.</u>**  Banks was gifted $25,000 that was ostensibly the return on an investment Rechnitz had handled for him, but was (unbeknownst to Banks) really a cash payment divorced from any investment mechanism, meant to keep Banks happy.  At the time, Banks had been leaning toward investing his money with Abe Friedman, a Brooklyn-based rival of

Reichberg's for police connections and attention.  (DX JR 1301; Tr. 2430-32, 3418).  Reichberg and Rechnitz persuaded Banks to "invest" with Rechnitz instead, so as to advantage themselves in the ongoing contest for Banks' affections and access to Banks' power.

- **Grant's Luxury Watch Upgrade.**  On December 24, 2013, Rechnitz purchased a watch upgrade for Grant, worth $800.  (GX 915; Tr. 2297, 2688-89).

- **Dinners at High-End Kosher Steakhouses.**  Harrington and Banks, in particular, were treated to countless expensive dinners at restaurants by Rechnitz and Reichberg.  (Tr. 5943-44, 5700; GX 218, 221, 551, 553).  At their peak, meals involving Harrington, Banks, Reichberg, and Rechnitz took place weekly.  (Tr. 2564-65).  Harrington and Banks did not pay.

- **The "Christmas Elves" Trip.**  As the Court is aware, on December 25, 2013, Reichberg and Rechnitz donned Santa Claus hats and drove to the homes of Grant, Harrington, and Eric Rodriguez, three of their cop targets.  They provided Grant's wife with diamond earrings, and provided the officers' children with video game systems and coveted American Girl dolls.  (Tr. 2433-34; GX 206, 307, 309, 504X, 552A, 1231, 1231A).

- **Tickets to Sporting Events.**  The record further reflects a pattern of profligate spending with respect to sports event-related purchases by the Reichberg-Rechnitz duo for their chosen circle of police officers.  The exhibits at trial included $6,000 worth of Brooklyn Nets basketball tickets for Phillip Banks in late 2013, (GX 1043); $2,400 worth of New York Rangers hockey tickets for Michael Harrington during the 2014 Stanley Cup Playoffs, (GX 1056, 1058); a

luxury box at a New York Jets game that cost $20,000, (GX 619B-E; Tr. 2893); and an estimated $1,200 worth of Yankee tickets, (DX JR 6643; Tr. 2929).

- **David Colon Gifts.**  Rechnitz paid for a $3,000 watch for Colon, (Tr. 2517); and a $2,000 hotel room for David Colon's daughter's birthday party, (GX 1018; Tr. 2516).  He also secured an internship with Tommy Hilfiger for Colon's daughter. (GX 1017).

Contrary to the suggestion in the defense submission, there is little ambiguity about what happened here.  The quids were clear.  The quos were clear.  And the jury credited the numerous indicia of connection between the benefits and the favors in finding Reichberg guilty of the conspiracy and honest services fraud offenses with which he was charged.  Among these were the unequivocal testimony of Rechnitz as to his own understanding, and Reichberg's understanding as communicated to him, as to why they were being so very generous with their cop "friends."  The jury also had the aforementioned lists of proven quids and proven quos, which were each themselves extraordinary and unusual enough to support strongly the commonsense notion that they were tied to each other.  Also compelling were the words of Reichberg, Rechnitz, Grant, and Harrington over four months of wiretap conversations, at a pivotal point in time when Banks had resigned from his seat at the Chief of Department, Harrington was increasingly preoccupied with his future (and that of Blue Guardian), and Reichberg was attempting to rekindle his relationship with  Grant.  (*See*, *e.g.*, GX W9971 (Grant discussing Rechnitz with Reichberg: "What's gonna happen is in fuckin' two to three weeks from now, a month from now, he's gonna fuckin' need a favor.  And then he's not gonna call Banks, he's gonna call me.")).  The participants in the conspiracy spoke of their connectedness. Grant complained about not feeling "love" anymore, with that failure of love taking the specific

form of the Christmas elves' failure to make a return engagement and Reichberg's failure to

invite him to a second Super Bowl trip to Las Vegas.  (GX W923, W05358).  Reichberg and

Rechnitz lamented that Phil Banks did not do enough for them while in office—a disappointment

that makes sense only because getting official action was *the very point of the conspiracy*.  (GX

W1964 (Reichberg:  "No, he did more for you than he did for me.  At least you got a plaque out

of it.  I didn't even get that.  He could've made… us liaisons in the Chief of Department's

Office."; Reichberg, a short time later: "Hey, we got Jimmy promoted"); *see* also GX W1836

(Reichberg:  "I never had to ask him for anything, but he was like, if there was – if the shit ever

hit the fan, he was always on our back.  You understand?")).

    In recognizing the link between the financial benefits and the police actions sought, the

jury also had the benefit of the evidence of Reichberg's actions once he believed that law

enforcement was closing in – the conduct at the heart of the final count of conviction.  The jury

heard evidence regarding the obstruction count that painted a clear picture: when Reichberg

became convinced that law enforcement was about to arrest him, Reichberg called his brother

over and gave him fistfuls of incriminating evidence to take with him when he left the house.

That the items were incriminating is beyond cavil—text messages recovered from the electronic

devices included important proof of the bribery and honest services fraud charges at trial, and the

stack of business cards taken from his brother's person by the F.B.I. served as a veritable

Rolodex of Reichberg's bribe contacts.

    The evidence at trial made clear that the Reichberg bribed and attempted to bribe not

simply officers walking the beat but senior and important members of the Department, including

Banks, Harrington, Grant, and others.  The list of affected officers did not end there.  Officers

like Chief Timothy Beaudette, commanding officer and precinct head, had to deal with

Reichberg and Rechnitz's attempt to pressure him.  Chief James Secreto, who resisted the allure of becoming one of Reichberg's "team players," had to bat away Reichberg and Rechnitz's entreaties.  Lieutenant Horace Norville had to shuttle Rechnitz's socialite friend around in a police car, in between bringing Banks to dinners with Reichberg and Rechnitz.  Untold numbers of officers involved reached out to Reichberg when in need of promotions or favorable transfers, as the text messages entered into evidence reflect.  Boat and helicopter pilots were diverted from their regular work on Reichberg's behalf.

And, perhaps worst of all, legions more officers, both during the conduct and after Reichberg's arrest, were left to wonder what message Reichberg's successful cultivation of his network of cops on call sent to them.  They were left to question what their allegiance to their oath meant in light of the officers above them whom Reichberg had corrupted.

## II.    The Charges

On April 3, 2018, a grand jury returned Superseding Indictment S2 16 Cr. 468 (GHW), which charged Reichberg and Grant in seven counts.  Count One charged Reichberg and Grant with participating in a conspiracy, along with Rechnitz and others, to deprive the people of New York City of the honest services of high-ranking NYPD officials.  Count Two charged Reichberg and Grant with the substantive crime of participating in a scheme to deprive the people of New York City of Grant's honest services.  Count Three charged Reichberg and Grant with participating in a conspiracy, along with Rechnitz and others, to offer and/or solicit bribes.  Count Four charged Reichberg with the payment of bribes and gratuities to Grant.  Count Five charged Grant with the receipt of bribes and gratuities from Reichberg and Rechnitz.  Count Six charged Reichberg and Grant with participating in a conspiracy, along with Rechnitz and others, to misapply property belonging to a program (the NYPD) receiving federal funds.  Count Seven charged Reichberg with obstruction of justice related to the events of the morning of his arrest.

14

Prior to trial, the Government withdrew Count Six, the misapplication count. As the jury received the Superseding Indictment, the obstruction count that had been denoted Count Seven was labeled Count Six.[3]

On January 2, 2019, after an eight-week trial, a unanimous jury found Reichberg guilty of Counts One, Two, Three, and Seven. The jury found Reichberg not guilty of Count Four, and acquitted Grant of all charges.

### III.  The Applicable Guidelines Range

#### a.  The Guidelines Range Calculation

In every case, the Guidelines range is the "starting point and the initial benchmark" for a sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007); see also 18 U.S.C. § 3553(a)(4) (requiring consideration of applicable Guidelines range in determining appropriate sentence). The Government agrees with the Guidelines Calculation set forth in the Presentence Report authored by the United States Probation Office, which is set forth in Paragraphs 39 through 59 of that Report.[4]

Specifically, Counts One, Two, and Three are grouped pursuant to U.S.S.G. § 3D1.2(d) (hereinafter, "Group One"). Group One is also grouped with Count Seven pursuant to Application Note 8 of U.S.S.G. § 3D1.2(d), because Reichberg was convicted of an obstruction offense related to the Group One offenses. The offense level for Group One is the offense level for the highest Guideline within it—here, Count Three—increased by two levels for obstruction of justice.

---

[3] Hereinafter, we will continue to refer to the counts as they were originally charged, consistent with the format used in the PSR, such that the obstruction count will be referred to as Count Seven.

[4] As set forth below, the Government acknowledges that reasonable minds can differ as to the applicability of the leadership enhancement included within that calculation. Although the

For Count Three, the base level is 12 pursuant to U.S.S.G. § 2C1.1, as referenced by U.S.S.G. § 2X1.1, the applicable Guideline for a violation of 18 U.S.C. § 371.   Because the offense involved more than one bribe, as the earlier recitation demonstrates, a two-level enhancement occurs pursuant to U.S.S.G. § 2C1.1(b)(1).  Here, the value of the payments (rather than the other side of the bribe transaction) is the controlling factor, because it exceeds the value of the benefit to be returned for the payment.  The value of the payments is greater than $150,000.  Accordingly, a ten-level enhancement applies under the U.S.S.G. § 2B1.1 table referenced within U.S.S.G. § 2C1.1(b)(2).  The public officials involved were inarguably in "high-level decision-making or sensitive" positions, and a four-level enhancement is therefore warranted under U.S.S.G. § 2C1.1(b)(3).

If the Court were to determine that the defendant was an organizer or leader of the criminal activity, a two-level enhancement would be warranted pursuant to U.S.S.G. § 3B1.1(c). As we note below, although the factual basis for such an enhancement exists, the Government will not take a position here on its appropriate application.

As mentioned above, a two-level enhancement applies to the Group for obstruction of justice.

The adjusted offense level is therefore 32 with the leadership enhancement, or 30 without it.

Reichberg has no prior convictions, and his criminal history is Category I.  His advisory Guidelines Range is therefore 121 to 151 months with the leadership enhancement included in the calculation, or 97 to 121 months without the enhancement.

### b.  Reichberg's Objections to the Guideline Calculation

The defense submission only takes serious issue with two aspects of this calculation. First, Reichberg claims that he was not an organizer or leader of the scheme, but that the bribery

conspiracy was an enterprise in which everyone was involved "more or less equally."  (Def.

Mem. 29).  Second, Reichberg contests the dollar value attached to the bribes, submitting that the

proper figure is somewhere between $6,000 and $15,000.

 With respect to the former, there is a basis from which one can conclude that Reichberg

is properly considered a leader of the scheme, without looking much further than his relationship

with Rechnitz.[5]  One can likewise conclude that Reichberg and Rechnitz are leaders with respect

---

 [5] The application note to U.S.S.G. § 3B1.1(c) provides that in order for the enhancement
to apply, the defendant "must have been the organizer, leader, manager, or supervisor of one or
more other participants."  U.S.S.G. § 3B1.1(c) n.2.  Reichberg organized and led the conspiracy
as it pertained to himself and Jona Rechnitz.  Reichberg was the keeper of the relationships with
police officers, relationships that predated Rechnitz's arrival.  Rechnitz's chief contribution was
cash, and merely being the bank does not translate as providing direction, organization, or drive.
 There is no clearer way to appreciate Reichberg's alpha-dog role within the arrangement
than to consider the many facets of this conspiracy Reichberg orchestrated in which Rechnitz
played literally no role.  Among these:

- Rechnitz had no knowing part in steering $60,000 worth of business to
  Harrington's security company as part of the conspiracy.  (Tr. 854-861).
  Rechnitz's ignorance of Harrington's connection to Blue Guardian was a matter
  that Harrington and Reichberg themselves discussed on the recorded telephone
  conversations.  (GX W2910).
- Reichberg, not Rechnitz, arranged for Boaz Gazit to replace Grant's windows,
  and further set up home improvements for Harrington.  Rechnitz was merely
  asked for payment by Reichberg.  (GX 553, 925; Tr. 2687, 4157-58).
- Reichberg, not Rechnitz, coordinated the response by their police contacts to the
  Zangi and Sankari arrests.  (GX 504W, 519L, 519M, 817, DX 9509; Tr. 189-95,
  197-201).
- Reichberg, not Rechnitz, coordinated the boat and helicopter dispatched through
  Michael Harrington to Reichberg's private events.  Rechnitz does not appear to
  have even attended the events.  (GX 503B, 503B-2, 503M-1 through 503M-4,
  553, 812).
- The abundant Reichberg text messages requesting NYPD information and action
  —regarding promotions, arrests, and the like—between and amongst Reichberg,
  Grant, Harrington, Milici, Andreano, and others, do not include Rechnitz's phone
  number.  (*See*, *e.g.*, GX 550–555, inclusive).
- Reichberg turned Rechnitz's planned getaway without any of the co-conspirators
  into one of its more prominent quids by insisting on bringing Grant and Milici.
  Reichberg then arranged for a prostitute to join them.  (Tr. 541, 2692-93).

Reichberg was the hub of the conspiracy and its driving force.  He directed Rechnitz in providing
financial benefits and coordinated favors from the NYPD.  He brought officers into his web, and

to the police officers involved they recruited and called upon.[6]  Certainly, the idea that all

participants were involved equally does not square with the evidence presented at trial.

However, in light of the practical reality that the Guidelines range without the enhancement

exceeds the Probation Office's recommended sentence anyway, the Government is willing to

forego taking a position on its applicability.

Reichberg's objections to the valuation of the gifts should simply be rejected.  Reichberg

argues that his culpability under the Guidelines ought to be limited to the things that he himself

paid for—a premise unsupported by law or the facts.  Here, the evidence established that

Reichberg was intimately involved in orchestrating and arranging the payments. That he did not

personally fund them is immaterial, particularly in the context of a conspiracy count where it is

black letter law that all members of the conspiracy are equally responsible for actions taken by

co-conspirators in furtherance of the charged scheme.  Reichberg is thus responsible for each of

those payments under the Guidelines.

And those payments were substantial: the value of the Blue Guardian payments alone, at

$60,000, is well past the range suggested by the defendant.  The private jet payments more than

double that sum; the trips to Las Vegas ($59,552) and the BCS Championship Game

($38,189.64) were also paid as part of the effort to woo the circle of police contacts.  Those three

items alone easily clear the $150,000 mark represented in the PSR's Guidelines calculation.

Reichberg's effort to suggest that this figure should be discounted because Rechnitz had already

paid for the flight is without merit; that fact does not change the value that a flight on a private

he introduced them to Rechnitz and continued to manage those relationships through Rechnitz's
participation.  He directed Rechnitz regarding when to pay for things, insisting time and time
again that a given officer had been "good to us."
[6] Conspiracies can, of course, have more than one person occupying a leadership role.  *See*
U.S.S.G. § 3B1.1(c) n.4.

jet would have had to each of the participants.  There is no exception to the bribery statute for the provision of benefits that someone else can or would also enjoy; as the Court has discussed and ruled upon in other contexts in this case, they remain "things of value."  (*See* Tr. 6619-20 (the Court's charge, which notes that "the wealth of or cost to the individual providing the item does not determine whether it is a thing of value")).

Further, the defendant's characterization of the source of the information regarding the total value of the bribes as "acquitted or uncharged conduct" is simply wrong.  Reichberg *was* charged with the conduct articulated above—the Bills of Particulars remove any doubt about that.[7]  The full array of conduct listed above is within the scope of Counts One, Two, and Three, of which Reichberg was unanimously convicted.  Grant's acquittal and the not guilty verdict as to Count Four do not change the calculus, even if one were to consider those bribes relating to him as acquitted conduct.  As Reichberg eventually acknowledges, under established law, the Court can consider conduct of which a defendant has been acquitted, so long as that conduct has been proved by a preponderance of the evidence.  *See United States* v. *Watts*, 519 U.S. 148, 152 (1997).  And even if the Court were to somehow excise from the case all financial benefits that involved exclusively Grant, the needle would not move sufficiently.  Milici was also on the $50,000 flight to Las Vegas, and under the tally below, the Guidelines range would remain unchanged because $150,000 is reached well before one has to consider the home improvements and hotel reservation that went to Grant exclusively.

The Court has a more than ample basis to resolve any dispute by finding, by a preponderance of the evidence, based on the exhibits and testimony presented at trial and cited

---

[7] Even if the conduct were properly considered acquitted or uncharged, its use in determining the proper Guidelines calculation is not a violation of the Sixth Amendment under established law. (Def. Mem. 36).

extensively in this memorandum, that the items above were provided by Reichberg and Rechnitz as part of the conspiracy alleged.  The two private jet trips and Blue Guardian business alone establish a bribe amount of approximately $158,000 dollars, well above the necessary threshold, before adding a portion of the Banks trip to Israel to the total, and before tallying a single meal or improvement to Grant's home on Staten Island.

Finally, Reichberg's attempt to dislodge the presumption that the payer of such bribes expected something of greater value in return rings hollow.  The purpose of that argument, it seems, is to somehow complicate a fairly straightforward policy statement within the application note to the 2C1.1 Guidelines: that in cases where the value of the bribe exceeds the value of the benefit, "the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe.  Moreover, for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater."   U.S.S.G. § 2C1.1 background n.  The reason for the general rule holds here.  Reichberg sought and obtained an intangible power whose value went beyond the individual police favors he received and dealt out to his associates – the ability to have his own private police force as opportunities demanded.  It is difficult to put a dollar value on the ability to divert a police helicopter up to Chelsea Piers from New York Harbor just so that your fellow pleasure boat attendees can applaud you and the NYPD, or to have a Deputy Inspector speed you through traffic to get you to the airport.  But such abilities are, obviously, quite rare.

The Court should not be dissuaded from the simple, commonsense appeal that the Guidelines reflect, and which Reichberg attempts vigorously to muddle: bigger bribes should

translate to bigger sentences.  They signal a sustained effort and commitment, and an attempt to apply even more control to the officers who were targeted.

## DISCUSSION

### I.    A Significant Sentence of Incarceration is Warranted

A meaningful sentence of incarceration akin to that proposed by the Probation Office is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(C).

#### a.    The Nature and Circumstances of the Offenses

The as-opportunities-arise bribery conspiracy that Jeremy Reichberg orchestrated was incredibly serious.  As this Court acknowledged in sentencing Harrington for the less severe but related offense of misappropriating police resources last year, wrongdoing of this nature involves real crimes with real impact on the broader community.

Some of the seriousness is evident in the wages of the bribery scheme itself – the favors Reichberg induced decorated officers to engage in.  For example, furthering the corruption of the NYPD's troubled Licensing Division, as Reichberg did, is hugely problematic for obvious reasons.  The Division receives some 5,000 applications for gun licenses every year, and the screening of those applicants is an important responsibility.  Reichberg caused NYPD officers in the Licensing Division to violate their duties to properly vet individuals seeking to maintain and carry firearms, and in so doing contributed to erosion of the public's faith in the NYPD and its commitment to gun safety.

But the seriousness of the offense touched the full breadth of the police action Reichberg obtained, whether it be the diverting of police resources, the interference with arrests, or otherwise.   Every police officer in New York City takes an oath to "protect the lives and property of all citizens of New York City by treating every citizen with courtesy, professionalism, and respect, and to enforce the laws *impartially*."  And Reichberg's conduct substantially undercut the public's faith in NYPD and its commitment to do those things, most of all, its commitment to "enforce the laws *impartially*."

Any loss of faith in the police is a tragedy in its own right.  It also has ripples on the way that citizens interact with police, and on the way that individual officers view their superiors' conduct and, consequently, their own responsibilities.  None of this mattered to Reichberg, who simply saw the opportunity to amass power and money.  He did so at a cost that, while difficult to quantify, was real and lasting.

Like many corruption offenses, Reichberg's was fundamentally a crime of selfishness. Reichberg wanted access to police power, the ability to have senior members of the Department on call.   His criminal conduct was far from an aberration.  The bad conduct in this case was comprised of a sustained pattern of individually corrupt acts over a period of *years*, involving efforts to recruit and corrupt over a half a dozen police officials to make use of as necessary.

Finally, Reichberg's obstruction with respect to his efforts to conceal certain of his devices and business cards – each representing or carrying strong evidence of the other crimes of conviction – is itself a serious crime that warrants a substantial punishment.  Obstruction of justice is nothing short of an effort to rob the court system, and the broader society, of the truth. Were it the only crime of conviction, it would still merit a meaningful sentence.

###### b.   The History and Characteristics of the Defendant

As noted above, crafting an appropriate a sentence for Reichberg requires a recognition that, at the time, Reichberg's illegal practices were not aberrational.    To that end, the Government draws the Court's attention to the "Additional Relevant Conduct" sections of the PSR (Paragraphs 33 through 34), which detail certain other conduct in which he and Rechnitz engaged, conduct that Rechnitz described in some detail in his testimony.  (*See*, *e.g.*, Tr. 2570-2576 and GX 1047 (Norman Seabrook bribery scheme), 2584-2610 (involvement with New York City political officials), 2610-2622 (involvement with Westchester County Executive Rob Astorino and Floral Park Police Department for chaplain positions), 2406-2408 (Reichberg's getting people out of jury duty with the assistance of court officer's union head Dennis Quirk).

Reichberg disputes some of these items.  As a general matter, the Government believes that its evidence at or in connection with trial with respect to each of these stands on its own. Some of these matters – including whether the favors Reichberg and Rechnitz sought from City Hall were, in fact, actually useful – have been argued at length before the Court already and do not require rehashing.  The Government nevertheless notes the following items.

With respect to the Seabrook bribery conspiracy, attached as Exhibit A please find wiretap transcripts entered into evidence in *United States* v. *Norman Seabrook*, 16 Cr. 467 (AKH), that show Reichberg assisting certain of the co-conspirators in planning and negotiating additional investments of millions of dollars of union monies as part of the same scheme. Attached as Exhibit B please find exhibits and summary charts from that trial regarding (a) evidence of the events of December 11, 2014, the day Rechnitz paid Seabrook a cash bribe, including phone records showing Reichberg's regular contact with key conspirators Rechnitz and Huberfeld on that day, and (b) Seabrook's calls immediately after a board meeting in July 2014 during which he steered millions of dollars to Murray Huberfeld's hedge fund as part of the

scheme concluded at 11:45 a.m.  (Once the meeting concluded at 11:45 a.m. and the basis for

Seabrook's earned his bribe had been secured, Seabrook's next three telephone calls were to

Huberfeld, Reichberg, and Rechnitz, in that order.)  The Government also notes that during

Huberfeld's sentencing proceeding a few weeks ago, the Honorable Alvin K. Hellerstein, United

States District Judge, who actually presided over the Seabrook retrial and saw the full array of

evidence of the conspiracy, expressed interest in finding some way to hold Reichberg to account

for the restitution to be made in that case.[8]  *See*, Feb. 12, 2019 Sentencing Tr., *United States* v.

*Murray Huberfeld*, 16 Cr. 467 (AKH), at 66.

   With respect to the state jury duty conduct, the Government respectfully directs the

Court's attention to a newspaper article published during the trial in which Quirk was

interviewed.  *See* Whitehouse, Kaja, "Video shows de Blasio donors allegedly delivering bribes

to cops," The New York Post, Nov. 20, 2018, https://nypost.com/2018/11/20/video-shows-de-

blasio-donors-allegedly-delivering-bribes-to-cops/, *last accessed* Mar. 26, 2019. During that

interview, which took place shortly after Rechnitz's direct testimony concerning the jury duty

activity, Quirk *admitted* helping Reichberg get people out of jury duty (but denied being paid for

it).  The Government further notes that Reichberg's assertion that the individual cited in the

defense submission is the only person reflected in the discovery in this case as having been so

assisted is incorrect.  To the extent it is still necessary to do so given Quirk's admission, we can

provide another example.

   Whether this conduct was illegal, unethical or both, the thrust of this point is that the

cops-on-call conspiracy reflected part of a pattern of dubious and downright criminal conduct by

---

[8] To be clear, Reichberg was not charged in the *Seabrook* case, and as a result, the Government does not intend, here or elsewhere, to seek an order with respect to restitution in that case against Reichberg.

Reichberg.  And although Reichberg does not have a formal criminal history, the Court can and should consider where the offense of conviction fit into the broader, troubling pattern of behavior Reichberg engaged in.

In considering the nature and characteristics of Reichberg, the Court should also consider Reichberg's lack of remorse.  *See, e.g.*, *United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)); *see generally United States v. Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform . . .).'" (citation omitted)).  At best, Reichberg has acknowledged that he has "made mistakes" and "acted in a manner of which he is not proud" and obliquely concedes falling in love with "the good life" that Rechnitz's wealth brought to the officers in his circle.  (Def. Mem. 3).  He does not lament having bought the services of NYPD officers and corrupting them.  Rather, he bemoans his having created "an appearance of impropriety and an unseemly situation where doubts about the police officers' integrity were inevitable" and thus creating a "disruption" his and their lives.  (Def. Mem. 20).  The Government understands that Reichberg maintains his innocence, and that is his right.  But he is not entitled to the sort of variance from the Guidelines defendants in this district often receive when they have fully come to terms with their criminal conduct.  Reichberg clearly has not done so.

Finally, the Government acknowledges the letters from Reichberg's family members.  It is unfortunately the case that incarceration often hurts families.  This, however, is true for nearly every defendant, including defendants whom judges sentence to significant time in prison for less serious or sustained offenses that Reichberg's.  What the PSR and letters make clear is that,

unlike so many families who have been thrust into difficult situations due to the misdeed of a loved one, the Reichberg family has the means, financial and otherwise, to sustain itself in the interim.

### c. Comparable Sentences

Reichberg notes that courts often vary downward from the bribery guidelines and provides a schedule of recent sentences relative to their PSR's Guidelines Calculation.  There is, of course, a limit to the utility of such a schedule – each case is different on a number of axes, ranging from the precise crimes and Guidelines at issue to the various Section 3553 considerations that always vary from person to person.

 Murray Huberfeld's sentence for his role in the Seabrook bribery, referenced on the second page of the defense's chart, illustrates this limited usefulness well.  Huberfeld pled out to a fraud offense that represented a narrow part of the broader bribery scheme, and as a result, his PSR Guidelines range and the Government's recommendation were relatively low.[9]  Judge Hellerstein disagreed with the parties' stipulated Guidelines range and applied the more punitive Guideline relevant to the bribery scheme to Huberfeld's sentence, which is not reflected in the chart.[10]   The chart does not tell Huberfeld's story well, and is likely not terribly useful for comparisons of most of these defendants.

Where does Reichberg fit among the sentences his chart?  Among the top, and perhaps, in a category of his own.  Like Sheldon Silver (84 months), Joseph Percoco (72 months), Norman

---

[9] The numbers regarding Peter Galbraith Kelly, one of the Peroco defendants, reflect a similar agreement between the defendant and the United States Attorney's Office.
[10] That Guideline, in turn, was appropriately less punitive than the one in this case because it concerned private honest services fraud, and did not involve the betrayal of a public trust as this case did.

Seabrook (58 months), and Dean Skelos (51 months),[11] Reichberg was the most significant actor

in his case, an affair that involved multiple quid pro quos and jaundiced New Yorkers' view of

an important local institution.  Unlike each of those defendants, Reichberg also obstructed

justice.

But there are other ways in which Reichberg may be said to present something of a *sui

generis* case.  As noted above, the Reichberg scheme involved sustained misconduct, with bribe

after bribe being contemplated and executed over years.  The very purpose was to get a broad

network of recipients.  By contrast, many of the schemes referenced in the defense chart were

more in the mold of "one-offs" – an isolated contemplated scheme involving perhaps a single

form of payoff to someone who knew better.

Further, to the extent that the sentence should "promote a respect for the law," as the

statute requires, the subject matter of this scheme is particularly intricately intertwined with the

machinery of respect of the law by virtue of it involving the paying off law enforcement officers.

Indeed, a scheme like this speaks to issues that resonate with the lives and interests of the vast

majority of people, and as a result, the sentence will have greater importance and potential

resonance for them as well.  It is very possible that the overwhelming majority of us will interact

with police at some point in our lives – either as people asking them for help, witnesses, arrestees

or detainees, or the loved ones of someone in one of those categories.  And in any event, we all

enjoy protection of the police even when we are not interacting with them directly – and should

enjoy it *equally*.  A crime involving the corruption of the police takes on a greater weight as a

result of this distinction.  It demands a muscular response for that reason.

---

[11] Silver and Skelos were sentenced to even longer sentences at the conclusion of their initial
trials; the figures in Reichberg's chart are the lower sentences obtained after retrial.

Finally, Reichberg takes pains to note that no other defendant connected to this case has been sentenced to prison time (with Rechnitz's sentence pending).  Setting aside the facts that Harrington pled out to non-bribery offenses, Grant was acquitted, and other officers were not charged, this only serves to highlight the degree to which, much more than the officers who flitted in and out of the scheme as they were called upon to perform a favor or given a gift, Reichberg and Rechnitz were the constants of the scheme.  Jeremy Reichberg was the gravitational center of the conspiracy.  He recruited officers and controlled the details of what they would do and what they would receive.  And Reichberg fulfilled that role on a consistent basis for years, while acting in a similarly unscrupulous fashion in other spheres.  If Reichberg, who was responsible for virtually all of the police action done over the life of the conspiracy, is more likely to see jail time than individual officers who only performed one or two or three tasks, it makes sense.

### d.  Deterrence Considerations

The above factors each militate in favor of a meaningful sentence.  But the Probation Recommendation pointed chiefly to deterrence considerations in justifying its recommendation.  This makes sense on both the general and specific registers.

It is particularly challenging to investigate and prosecute corruption schemes successfully, particularly where, as here, the scheme involves somewhat diffuse conduct and a broad set of actors.  This means that when such a scheme is uncovered, and a leading individual is successfully prosecuted and convicted, a substantial sentence is warranted.  *See*, *e.g.*, *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)

("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States* v. *Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").  That schemes involving widespread corruption at senior levels of the NYPD are likewise incredibly rare only amplifies this consideration.  Where crimes are rare, each sentence takes on a greater meaning with respect to the message sent to others who might consider the same poor choices.  Further, the particular visibility of this case, and the nature of the offense, also militate in favor of a strong sentence.

As for specific deterrence, Reichberg's apparent widespread pattern of corruption, and the contempt for the law that he displayed compounding his errors by obstructing justice, suggest that a sentence meant to deter Reichberg from future offenses is both needed and appropriate.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court impose a

substantial term of imprisonment, consistent with the Probation Office's recommendation, a

sentence that is sufficient but not greater than necessary to serve the legitimate purposes of

sentencing.

Dated: New York, New York
       March 27, 2019

                                         Respectfully submitted,

                                         GEOFFREY S. BERMAN
                                         United States Attorney

By:          /s/
                     Martin S. Bell
                     Jessica Lonergan
                     Kimberly J. Ravener
                     Assistant United States Attorneys
                     Southern District of New York
                     (212) 637-2463/1028/2358

cc:     Susan Necheles, Esq.
        Gedalia Stern, Esq.